THOMSON-HOUSTON ELECTRIC CO. v. HOOSICK RY. CO.

(Circuit Court of Appeals, Second Circuit. July 21, 1897.)

1. APPEALS IN PATENT CASES—PRELIMINARY INJUNCTION—SCOPE OF REVIEW.
   On appeal from an order granting a preliminary injunction in a patent case, where the court below bases its action entirely upon a prior decision in another circuit, sustaining the patent, the circuit court of appeals is not itself constrained to adopt the rulings of such other circuit court, but is at liberty to re-examine the same, and dispose of the questions of law conformably to its own convictions, giving to the former adjudication only such weight as, in its own judgment, the same is entitled to.

2. PATENTS—VALIDITY—PRIOR PATENT FOR SAME INVENTION—TROLLEY RAILWAYS.
   The Van Depoele patent, No. 495,443, for a "traveling contact for electric railways," examined, and compared with the prior patent No. 424,695, to the same inventor, and held to be for the same invention covered by that patent so far as concerns the claims which relate to the combinations between the contact device and the suspended conductor and to the structural features of the contact device, and the later patent therefore held invalid as to claims 6, 7, 8, 12, and 16.

Appeal from the Circuit Court of the United States for the Northern District of New York.

This was a suit in equity by the Thomson-Houston Electric Company against the Hoosick Railway Company for alleged infringement of a patent for traveling contacts for electric railways. The circuit court entered an order granting a preliminary injunction, and the defendant has appealed.

Charles E. Mitchell, William C. Witter, and Robert N. Kenyon (Henry B. Brownell, of counsel), for appellant.

Betts, Hyde & Betts, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. This is an appeal from an order granting a preliminary injunction restraining the defendant from making, using, or vending the apparatus specified in claims 6, 7, 8, 12, and 16 of letters patent No. 495,443, granted April 11, 1893, to the administrators of Charles J. Van Depoele, assignors to the complainant, for

"traveling contact for electric railways." The application for the injunction was resisted upon the ground that the patent as to these claims was void, because the inventions covered thereby had been previously patented to the same inventor by letters patent No. 424,-695, granted April 1, 1890, for "suspended switch and traveling contact for electric railways." The validity of the claims, notwithstanding a similar defense, had been adjudicated at final hearing in the case of This Complainant v. Winchester Ave. Ry. Co., by the circuit court for the district of Connecticut (71 Fed. 192). In granting the present injunction, the court below followed that adjudication, without attempting an independent consideration of the validity of the defense.

The preliminary question arises whether upon this appeal the court should undertake to examine, and in a sense to review, collaterally the decision in the Connecticut cause, or should confine itself to the inquiry whether, from the standpoint of the court below, the order was properly granted. We had occasion to consider this question in American Paper Pail & Box Co. v. National Folding Box & Paper Co., 1 U. S. App. 283, 2 C. C. A. 165, and 51 Fed. 229, and adhere to the views which were then expressed. We said:

"While the circuit court, upon a motion for an injunction, might deem itself constrained, contrary to its own judgment, to adopt the rulings of another circuit court upon questions of law made at final hearing, this court is at liberty to re-examine such rulings, dispose of the questions of law conformably to its own convictions, and accord to the former adjudication such weight as, in its own judgment, it was entitled to upon the motion."

The former adjudication was entitled to great weight upon the application for the preliminary injunction, and justified, although it did not necessarily control, the decision. If it had been founded upon evidence not before the court upon the application for the injunction, or not so fully before it, it could not have been intelligently considered by that court; and there would have been no record here upon which it could be re-examined. But the question whether two patents are for the same invention is a question which is to be determined by a comparison of the documents themselves. There may be cases in which it is necessary to resort to extrinsic evidence to ascertain the meaning and the true construction of the documents. The present was not such a case. The patents are unambiguous, and even the file wrappers, which are in the record, are of little value as extrinsic evidence.

Both patents originated in the application of Van Depoele, filed in the patent office March 12, 1887, and relate to the apparatus of that class of electric railways in which a suspended conductor conveys the working current; and a contact device carried by the car is employed for taking off the current, and more particularly to an improved traveling contact, and an improved arrangement and construction of the switches by which the traveling contact is directed to the proper conductor, and to various details of construction and arrangement of the traveling contact and switches. The application was divided, and, while one of the divisional applications was involved in an interference proceeding which delayed the issuance of a patent, the other

divisional application culminated in the patent granted April 1, 1891. In the earlier patent, the patentee, after stating that his invention "relates to electric railways of the class in which a suspended conductor is used to convey the working current, a traveling contact carried by the car for taking off the current for use in operating the motor by which the car is propelled, and the return circuit completed through the rails," states that it consists in certain devices, and their relative arrangement, by means of which a contact device carried by a rod or pole extending from the car, and pressed upwardly into contact with the conductor, is switched from one line to another, correspondingly with the vehicle. He further states that while, to illustrate his invention, he has shown it applied to a contact device which forms the subject-matter of an earlier application for a patent (the later patent), and while he does not intend to claim generally a contact device of this construction, he does make claims to certain details thereof, which are of especial value in connection with his improved switching devices, but which are not essential features of the contact device itself, considered without reference to the switch. In the later patent the patentee states that his invention consists more particularly in an improved traveling contact, and in improved arrangement and construction of the switches by which the said traveling contact is directed into the proper conductor, but that he does not propose to claim the switching devices, although the description and illustration of them are retained because these devices have been already claimed in his patent No. 424,695 (the earlier patent). The later patent also states that, in a still earlier application for a patent, the patentee had shown and described a contact device, consisting of a grooved roller, mounted upon a spring, and sustained thereby a short distance above the roof of the car, but this was in practice found deficient in capacity to follow the sinuosities and deflections of the overhead conductor as ordinarily put up; and he then proceeds to point out the advantages of the use of such a device as is particularly described in the later patent; and he further states that many modifications and minor changes in the invention described will readily suggest themselves to persons skilled in the art, and he does not propose to limit himself to the precise details of construction or arrangement shown.

The claims of the earlier patent are 35 in number, and are addressed more particularly to combinations between the conductor switches and the traveling contact; while the claims of the later patent, which are 16 in number, are addressed more particularly to combinations between the traveling contact and the suspended conductor.

The earlier patent contains a number of claims in which the switching devices are not an element, and the later a number in which they are an element. As these devices are not an element of the combination in either of the five claims of the patent in suit which have been adjudicated, any extended consideration of them will be unnecessary, and the comparison between the two patents will be mainly confined to the descriptive parts and claims of each which relate to the combinations between the contact device and the suspended conductor, and to the structural features of the contact device. These parts are illustrated in each patent by the same drawing (Fig. 1).

The specification of each patent describes a car and a suspended conductor which are identical. Each describes a contact device, or trolley, belonging to the order of "under-running" contacts, and which consists of a swinging arm carrying a grooved wheel at one extremity, and a tension device for regulating its movements. The arm is mounted upon a post on top of the car, and is pivoted and swiveled so as to be capable of swinging both vertically and horizontally through considerable arcs. The tension device is attached to the short end of the arm, and regulates the movements of the arm by pulling the short end down, and holding it in its normal position, while the grooved wheel at the long end is pressed upward into engagement with the under-side of the suspended conductor. These parts, as described in both specifications, with the exception of the tension device, are identical in all their essential features. The description of the tension device is the same in each patent except that the words in italics appear in the specification of the earlier patent, and are omitted in the specifica tion of the later patent. It is as follows:

"To the lower end of the arm, F, is attached a spring, G, to the lower extremity of which is secured a cord which passes downward through suitable grooves or suitable rollers, and is provided with a weight, H, which serves to hold the spring down, and keep the contact wheel, E, always pressed up against the underside of the conductor, D. At the same time, the spring will instantly yield to allow the wheel to pass under the switch or any obstruction; *and while the arm, F, is movable laterally with respect to the vehicle, the spring and weight will constantly tend to restore the arm to its normal central condition, and assist in carrying the contact arm to partake in the lateral movement of the vehicle.* Being held in position by the weight, *the wheel has a much greater range of action, and, moreover,* the motorman can at any time lower the contact wheel by raising the same, rendering the arrangement very convenient for many purposes. * * * The arm, F, is of a length that will place the contact wheel, E, about over the rear pair of wheels of the car; and the position of the post, f, and the length of the arm, F, itself, will therefore vary with the length of the body of the car, the particular proportions shown being only by way of illustration. The arm, F, is hinged, and should in most instances be also pivoted to the top of its post, f, although a reasonable amount of looseness in the hinged joint will answer the purpose of the pivot, and prevent binding or straining at that point, due to the swaying of the vehicle or deflection of the conductor. * * * The contact-carrying arm described in the present application possesses substantial practical advantages over any other means yet proposed for establishing moving contact between a vehicle and a stationary supply conductor, in that, by the use of a hinged flexibly mounted arm, much greater freedom of movement is compatible with the maintenance of a positive mechanical connection and electrical contact between the vehicle and supply conductors."

Among the claims of the earlier patent are these:

"(15) In an electric railway, the combination of a car, a conductor suspended above the line of travel of the car, a contact-carrying arm pivotally supported on top of the car, and provided at its outer end with a contact roller engaging the underside of the suspended conductor, and a weighted spring at or near the inner end of the arm, for maintaining said upward contact, substantially as described."

"(31) In an electric railway, the combination, with an overhead conductor and a vehicle, of an intermediate contact device, consisting of a trailing arm having a grooved contact wheel at its outer end, and moving laterally relatively to the vehicle, but provided with a spring tending to retain it in its normal central position.

"(32) In an electric railway, the combination, with an overhead conductor and a vehicle, of a trailing contact arm guided at its outer end by the overhead

conductor, and movable laterally relatively to the vehicle, but having a normal centralizing tendency by means of a spring or weight.

"(33) In an electric railway, the combination, with an overhead conductor and a vehicle, of an intermediate contact device, consisting of an upwardly pressed trailing arm, having a grooved contact wheel at its outer end, by which it is guided by the conductor, the said arm being free to swing laterally relatively to the vehicle, but tending to remain in its normal central position by means of a spring or weight.

"(34) The combination, with a vehicle and an overhead conductor, of a trailing contact arm guided normally by the conductor, but having a spring connection with the vehicle tending constantly to maintain it in a definite position, while at the same time it is free to swing laterally with respect to the vehicle against the pressure of the said spring.

"(35) In an electric railway, the combination, with an overhead conductor and a vehicle, of an intermediate contact device, consisting of a rearwardly extending arm guided at its outer extremity by engagement with the conductor, and movable laterally relatively to the vehicle, but having a spring or weight tending to restore it to its normal central position."

### The five claims in controversy of the patent in suit are as follows:

"(6) In an electric railway, the combination with a suitable track and a supply conductor suspended above the track of a car provided with a swinging arm carrying a contact device in its outer extremity and means for imparting upward pressure to the outer portion of the arm and contact, to hold the latter in continuous working relation with the underside of the supply conductor, substantially as described.

"(7) In an electric railway, the combination of a car, a conductor suspended above the line of travel of the car, a swinging arm supported on top of the car, a contact device carried by one extremity of the arm, and held thereby in contact with the underside of the electric conductor, and a tension device at or near the other end of the swinging arm for maintaining said upward contact, substantially as described.

"(8) In an electric railway, the combination of a car, a conductor suspended above the line of travel of the car, an arm pivotally supported on top of the car, and provided at its outer end with a contact engaging the underside of the suspended conductor, and a tension spring at or near the inner end of the arm for maintaining said upward pressure contact, substantially as described."

"(12) In an electric railway, the combination with a car of a post extending upward therefrom, and carrying a suitable bearing, an arm or lever carrying at its outer end a suitable contact roller, and pivotally supported in said bearing, and provided at its inner end with a tension spring for pressing the outer end of the lever carrying the contact wheel upward against a suitable suspended conductor, substantially as described."

"(16) In an electric railway, the combination of a car, a conductor suspended above the line of travel of the car, an arm pivotally supported on top of the car, and provided at its outer end with a grooved contact wheel engaging the underside of the suspended conductor, and a tension spring for maintaining an upward pressure contact with the conductor, substantially as described."

In considering the question whether both patents covered the same invention, Judge Townsend, in the Connecticut cause, speaking of the earlier patent, said:

"The original application, filed March 12, 1887, claimed a spring and tension device so arranged as to impart upward pressure. The improved device showed a spring and weight so arranged as to permit lateral motion by the arm, and to 'constantly tend to restore the arm to its normal central position, and assist it to partake of the lateral movement of the car,' to give it a greater range of action, and make it more convenient in operation. This patent for this specific combination, adapted and claimed only for this specific purpose, applied for October 22, 1888, after the original application had been allowed, but before the patent thereon had been granted, was earlier in the date of issue. The original application was delayed by interference proceedings in the

patent office. Whatever may be the rule as to cases where the application for the general patent was filed subsequent to the application for the specific patent, I do not think the patentee should be deprived of his broad patent where the application for such patent was made first, and was delayed in the patent office through no fault of the inventor."

With these conclusions we are unable to agree. We should concur if we could regard the later patent as the generic one, and the earlier, so far as it relates to the contact device, as limited to the structural improvements upon that device. But we are of the opinion that, although the earlier patent contains matter of disclaimer inserted for the purpose of making the later patent ostensibly the generic one so far as it relates to the contact device, such matter is antagonized by, and is wholly inconsistent with, some of the claims. Those claims in which the switching devices are not an element have no place in the patent, and would be in effect obliterated, unless they cover combinations between the suspended conductor and such a contact device as is described in the specification. In case of conflict, the claims, which are the final and definite expression of the patentee's intention, must control.

The operative parts of the contact device are described in identical language in each patent, and the language of the claims aptly describes these parts. While the function of the tension device is stated with more particularity in the earlier patent, the description does not contain a word or hint by which its characteristics can be differentiated from those of the tension device of the later patent. The additional matter is, in effect, a fuller statement of the advantages of the device. In the later patent, as well as in the earlier, the tension device is a spring and weight so arranged as to "permit lateral motion by the arm," lateral motion being afforded because, as the specification of each patent states, "the arm is hinged, and should in most instances be pivoted to the top of the post, f, although a reasonable amount of looseness in the hinged joint will answer the purpose of the pivot." In the earlier as well as in the later patent the spring and weight "are so arranged as to constantly tend to restore the arm to its normal central position," and thus "assist it to partake of the lateral movement of the car," because this is the necessary action of the spring and weight at the short end of the arm. As described in each specification, the tension device is a spring which is held in its proper place by the weight. The spring alone, if fastened to the top of the car, would perform the function of restoring the arm to its normal central position. So would the weight "secured by a cord which passes downward through suitable grooves," or through the roof of the car as shown in the drawings. The weight and spring together re-enforce one another, and allow greater freedom of movement to the arm when arranged as described and shown in both patents. The device, of necessity, exerts a centralizing tendency upon the arm, and serves to maintain upward contact between the grooved wheel and the suspended conductor. Of course, if the claims of the earlier patent do not specify such a tension device as is described and claimed in the later, but specify one which embodies only a subordinate improvement upon it, the patents are not for the same invention.

As was said by this court in Thomson-Houston Electric Co. v. Elmira & H. Ry. Co., 18 C. C. A. 154, 71 Fed. 404:

"An inventor, by describing an invention in a patent granted to him, does not necessarily preclude himself from patenting it subsequently. His omission to claim what he describes may operate as a disclaimer or an abandonment of the matter not claimed; but it has no such effect when it appears that the matter thus described, but not claimed, was the subject of a pending application in the patent office by him for another patent. * * * The invention secured by a patent is that which is secured to the patentee by the claim. * * * The claim, however, is to be read in the light of the description contained in the specification, and its literal terms may be enlarged or narrowed accordingly, but not to an extent inconsistent with their meaning. Identity of language in the claims of two patents does not necessarily import that the invention patented by each is identical, nor does a difference in phraseology necessarily import that they are for different inventions. The test of identity is whether both, when properly construed in the light of the description, define essentially the same thing. When the claims of both cover and control essentially the same subject-matter, both are for the same invention, and the later patent is void."

In determining what kind of a tension device is specified in the claims of the earlier patent, it will be observed that in claim 31 it is defined as a "spring tending to retain" the trolley arm in its normal central position; in claim 32 it is defined as a "spring or weight" exerting a normal centralizing tendency upon the arm; in claim 33 it is defined similarly as in 32; and in claim 34 it is defined as a "spring connection" tending constantly to maintain the arm in a definite position.

The tension device specified in the claims of the later patent is defined in claim 6 as "means for imparting upward pressure to the outer portion of the arm"; in claim 7 as "a tension device for maintaining said upward contact"; in claim 8 as a "tension spring for maintaining upward pressure contact"; in claim 12 as a "tension spring for pressing * * * upward"; and in claim 16 as a "tension spring for maintaining an upward pressure." Inasmuch as the only tension device or means for imparting upward pressure to a trolley arm described in the specification of the later patent is that which consists of the weight and spring as it is described in the earlier patent, the verbal differences in defining its functions in the several claims are of no significance. The thing itself is the same in the claims of both patents. The spring which tends to retain the arm in its normal position is exactly the same spring, and no other, than that which maintains upward contact or pressure between the contact device and the suspended conductor. If any importance is to be attached to these verbal differences, the earlier patent claims a tension device the chief function of which is to exert a normal centralizing tendency upon the arm, but which, of necessity, must maintain the upward pressure; while the later patent claims one the chief function of which is to maintain upward pressure, but must, of necessity, also exert the normal centralizing tendency. If there had been in the description anything by which it could be ascertained which of the structural features exercises one function, and which the other, a different case would be presented. "The matter sought to be covered by the second patent is inseparably involved in the matter embraced in the former patent,

and this, under the authorities, renders the second patent void." Miller v. Manufacturing Co., 151 U. S. 198, 14 Sup. Ct. 310.

It is manifest that both patents are intended to, and do, secure to the patentee the same general inventions as are comprised in the combination of suspended conductor and contact devices, and the combination of suspended conductor, contact device, and switching devices, although the earlier patent also covers improvements in the switches and subordinate combinations between these devices and the elements of the principal combination.

Claim 13 of the patent in suit, for the combination between the suspended conductor, the contact device, and the switching devices, is identical in its phraseology with claim 6 of the earlier patent. That claim reads as follows:

"(13) In an electric railway, the combination of an electrically propelled car, a supply conductor suspended over the line of travel of the car, a swinging arm mounted upon the car, and carrying a contact device at its free end, said contact arranged to bear against said conductor, suitable switching devices upon the track traversed by the wheels of the car, and corresponding switches on the suspended conductor located above those on the track, and arranged to engage the contact devices, substantially as described."

The later patent describes the switching devices of the earlier patent in all their essential features, except as to the subordinate improvements thereon; and claim 13 must be construed as specifying the identical invention specified in claim 6 of the earlier patent. On the other hand, claim 15 of the earlier patent, for the combination between the suspended conductor and the contact device, is identical in phraseology with claim 9 of the patent in suit. The switching devices having been fully described, the matter of disclaimer inserted in the later patent is of no more value in determining its scope and interpretation as to the claims in which the switches are an element than is the matter of disclaimer inserted in the earlier patent as to the claims in which the contact device is an element.

We are of the opinion that claim 15 of the earlier patent describes and embraces everything of substance which is covered by claim 7 of the patent in suit. Claim 15 specifies a combination the elements of which are the car (implied necessarily, and needlessly mentioned), the suspended conductor, and the contact device. The element termed "a contact-carrying arm pivotally supported on the top of the car, and provided at its outer end with a contact roller engaging the underside of the suspended conductor," exactly defines all the essential features of the contact device described in each specification, except the tension device. It must be hinged as well as pivoted; otherwise, the tension device will be inoperative to maintain upward pressure. The element termed "a weighted spring" is the complete tension device described in both specifications, and which, as described, necessarily exercises the twofold function of maintaining upward contact between the contact device and the suspended conductor, and of maintaining the pivoted arm in its central or normal position. The "tension device" of claim 7 is the whole device described in that patent, as the "weighted spring" of claim 15 is the whole device described in the earlier patent.

Claim 15, however, does not specify the combinations of claims 8, 12, and 16 of the patent in suit. The "tension spring" of those claims is not necessarily the "weighted spring" of claim 15.

We are also of opinion that claim 33 of the earlier patent specifies essentially the same combinations embraced in claims 8, 12, and 16 of the patent in suit, and that the "spring or weight" of claim 33 is the same thing as the "tension spring" of claims 8, 12, and 16, the "weight" being only an alternative element. It would be a waste of time to dwell upon the verbal differences in these claims. The changes in phraseology import nothing of substance into their respective combinations. They describe the same things in different language, and the draftsman seems to have expended great ingenuity in cataloguing a group of synonyms.

The order granting the preliminary injunction is reversed, with costs.