BADISCHE ANILIN & SODA FABRIK v. A. KLIPSTEIN & CO. et al.

(Circuit Court, S. D. New York.   October 12, 1903.)

1. FOREIGN CORPORATION—PROOF OF INCORPORATION.
   The testimony of lawyers of a foreign country that certain acts, documents, and records proved had the effect of creating complainant a corporation under the laws of such country is sufficient, prima facie, to establish the corporate character of complainant; and the court will not undertake to construe the statutory law of such country for itself, and therefrom to determine that such testimony is incorrect.

2. PATENTS—SUIT FOR INFRINGEMENT—EFFECT OF PRIOR DECISION.
   When a patent has once been sustained by an appellate court, a subordinate court, dealing with the same patent subsequently, inquires first whether the second record contains anything not before the appellate court, and, if it finds something new, inquires next whether the new matter is of such a character that it may fairly be supposed that the appellate court would have reached a different conclusion, had it been advised of its existence.   The authority of its decision is not limited to the facts and defenses discussed in its opinion, but extends to all that were before it in the record.

3. SAME—PRIOR USE—DATE OF INVENTION IN FOREIGN COUNTRY.
   As against an infringer, the patentee in a United States patent for an invention previously made by him and patented in a foreign country may, to avoid alleged use in this country before the date of the foreign patent, show the date of the application for the foreign patent, for the purpose of showing the actual date of his invention.

4. SAME—CONTEMPORANEOUS APPLICATIONS—GENERIC AND SPECIFIC CLAIMS.
   An inventor has the right, by contemporaneous applications, to a generic and specific patents; and, when he has thus applied, he does not lose the right to his generic patent because one or more of the specific patents may happen to be issued first.   Nor does he lose such right by the subsequent filing of an amended or new application changing the specification of the generic invention, where the patent is still sought for the substance of the invention as originally claimed.

5. SAME—PROOF OF INFRINGEMENT—SALE BY CORPORATION.
   Proof of the sale of an infringing article at the place of business of a corporation by one there found apparently engaged in his ordinary occupation as salesman, and who gives appropriate instructions as to the method of use of the article, is prima facie proof of infringement by the corporation.

6. SAME—SALE TO COMPLAINANT'S AGENT.
   The sale of an infringing article to an agent of the owner of the patent, while it may not afford a basis for the recovery of damages or profits, constitutes an infringement, which entitles such owner to an injunction; and where two such sales are proved, made at different times from a stock on hand, the seller apparently supposing that the purchaser was buying in the regular course of business, it is sufficient to support an inference that other similar sales were made, and to warrant a decree for an accounting, in the absence of any evidence to contradict or explain the transactions.

7. SAME—INFRINGEMENT OF PATENT FOR CHEMICAL COMPOUND—PROOF OF IDENTITY.
   Where a competent expert has analyzed an alleged infringing chemical compound, applying the tests given in the specification of the patent, as well as others, and testifies, as a result of such analysis, that the compound is that of the patent, such evidence is sufficient, prima facie, to prove infringement.

8. SAME—VALIDITY AND INFRINGEMENT—DYESTUFF.
   The Julius patent, No. 524,254, for an unsulphonated water-soluble safranine azo naphthol dyestuff, considered, and *held* valid as against the

defenses of anticipation by prior patents and publications, prior use, and insufficiency of description; also *held* infringed as to claims 1, 2, and 4.

In Equity. Final hearing on pleadings and proofs. The suit is for infringement of United States letters patent 524,254, August 7, 1894 (application filed April 1, 1893), to Paul Julius, assignor to complainant, for safranine azo naphthol lake. Patented in England, No. 4,543; issued January 2, 1892, on an application of March 13, 1891.

Gifford & Bull, for complainant.

Forbes & Haviland, for defendants.

LACOMBE, Circuit Judge. Defendants object to the maintenance of the suit on the ground that there is "no proof of the incorporation of the complainant, and therefore of its capacity to sue." Counsel for complainant contends that such objection can be raised only by a special plea in abatement or bar. This question of practice need not be passed upon, since upon the record the incorporation of complainant is proved. A corporation is an artificial person. Its birth is regulated by the laws of the sovereignty which permits it to be created. What acts of private and official persons, what documents and records, shall operate to create a corporation, are settled by the laws—usually by the statute laws—of the state which fathers it. No one can tell whether or not a corporation has been created unless he be familiar with the law of such state. One familiar with such law can easily determine the question. When the question of incorporation is raised, touching an alleged foreign corporation, the inquiry calls for proof of the law of a foreign country. The nature of such proof was discussed by the Court of Appeals in this Circuit in Herbst v. S. S. Asiatic Prince, 108 Fed. 289, 47 C. C. A. 328, from which the following excerpt is taken:

"The law of a foreign county [is] proved here by calling its lawyers * * * and interrogating them. That has been done in this case, with a result which certainly warrants the conclusion that the proof is overwhelmingly the one way. It is true that as to the law of Brazil the only witness called by the claimant was a young lawyer, but his statements are direct, positive, and reiterated, * * * and there is no reason apparent why his statements should not be accepted."

In the case of The Asiatic Prince, the law sought to be proved was contrary to that prevailing in all other maritime countries. The court proceeds:

"There was abundant opportunity to take the testimony of some other lawyer, * * * if the statements of claimant's witness were inaccurate; * * * but libelant has contented himself with printing copious excerpts from the statute law of Brazil, which he insists do not sustain the witness' statement. * * * Such a method of criticising the testimony of a foreign lawyer as to the law which prevails in his country is unpersuasive. There is much more than the text of a statutory enactment to be considered. Departmental regulations, administrative construction, judicial exposition, are often quite as important. The text of the act of Congress of February 26, 1885, c. 164, 23 Stat. 332 [U. S. Comp. St. 1901, p. 1290], might well convey to a jurist in some foreign country a different meaning from that which it conveys to a lawyer here, who is familiar with Holy Trinity Church v. U. S., 143 U. S. 457 [12 Sup. Ct. 511, 36 L. Ed. 226]."

In the case at bar the law for the introduction of the General German Commercial Code into the grand duchy of Baden, and a part of said Code, are set forth. Exemplified or sworn copies are also produced of the articles of association of the complainant company, of a certain request by such company for entry in the commercial register at Mannheim, and of two entries in such register—one relative to the organization of the company, and the other to an extension of its term. Two German lawyers, duly qualified as experts, were sworn on behalf of the complainant, and testified that such acts, documents, and records, under the German law, were competent to make of the associates a corporation for an unlimited period, with capacity to sue and to be sued. This is certainly prima facie evidence of incorporation, and, in the absence of any evidence to the contrary (no expert in German law was called by defendants), must be taken as conclusive. The brief submitted on behalf of defendants contains an elaborate and ingenious analysis of the German law, but it is not proof of what that law is, under the decision in The Asiatic Prince, supra.

The patent sued upon was before this court in Badische Anilin v. Kalle (C. C.) 94 Fed. 163. It was sustained in all particulars, and infringement found of claims 1, 2, and 4, the same involved here. The Kalle Case was appealed to the Court of Appeals in this circuit, and the decision below was affirmed. 104 Fed. 802, 44 C. C. A. 201. According to well-settled practice, the earlier decision in this court is to be followed here, and the decision of the Court of Appeals is, of course, controlling upon this court. The Kalle Case was vigorously contested by counsel of great ability and large experience. The record presented was elaborate and of great length; a large mass of documentary evidence, patents, and publications was put in; and 11 experts testified on behalf of the defendants. The briefs submitted were exhaustive and highly technical, the oral arguments in both courts were extended far beyond the usual time allowance, and the opinions of both courts are exceptionally long and elaborate. Decision under such circumstances means something, and the first question presented here is precisely what it does mean. Defendants advance the proposition, which no one will dispute, that, since the judgment of a court is founded on facts, it is authority only as to the facts upon which it is founded. But defendants' counsel go further, and insist that it must be taken that those facts are such only as are found stated in the opinion. If the important distinction between fundamental facts and facts which are merely probative be carefully observed, this proposition, also, might be conceded; but they seem to ignore all such distinction, and to contend that, as to every individual, specific fact of which the record affords proof, but which is not found restated as a fact in the opinion, the court before whom similar issues are again presented may treat it as new, in the sense that it has not been passed upon by the court which first tried the issue. To illustrate: If, in a suit upon a patent, 17 alleged anticipating patents are set up, and the court, in its opinion, discusses only 2 of them, which it thinks most nearly approach the invention of the plaintiff, another court dealing with the same patent is not to assume that the first court considered the other 15 alleged anticipating patents, nor that it held

that they neither anticipated nor narrowed the field of invention too much to leave room for plaintiff's device to stand. Such a practice would make patent litigation interminable, and would be intolerable alike to litigants, to the bar, and to the courts. The rule is well settled that, when a patent has once been sustained by an appellate court, a subordinate court, dealing with the same patent subsequently, inquires first whether the second record contains anything not before the appellate court (whether mentioned in its opinion or not), and, if it finds something new, inquires next whether the new matter is of such a character that it may fairly be supposed that the appellate court would have reached a different conclusion, had it been advised of its existence. It is unfortunate that defendants have failed to appreciate this rule. Counsel have given a great amount of time, thought, and labor to the preparation of an elaborate and highly technical brief and argument, the greater part of which might be most helpful on a motion for reargument of the Kalle Case, but which, to a court situated as this is, is necessarily unpersuasive and to be disregarded.

It is unnecessary here to set forth the patent, or to discuss the invention to which Julius made claim. The specifications have been most fully quoted from and the prior state of the art set forth in the opinions in the Kalle Case. It is to be assumed that no one will undertake to read this opinion who has not familiarized himself with the earlier ones. It will be sufficient, therefore, to take up the subject where the Kalle Case left it, and see whether there is any new evidence as to anticipation or the prior art, and what such evidence amounts to. In the Kalle Case it was held that Julius was the first to give to the public a safranine azo naphthol, which, although unsulphonated, was soluble in water. That record contained prior patents and publications which disclosed unsulphonated safranine azo naphthol, and set forth formulas for producing it. The literature of the art, however, whenever it made a statement as to such characteristic, referred to it as insoluble in water. Some of the earlier publications made no such statement (i. e., as to whether or not it was water-soluble), but their statements of formulas lacked definiteness. As to one or more ingredients, in the language of the court, they "left a blank," which the art, so far as set forth in literature, did not tell any one how to fill so as to get a soluble product. There was much testimony as to the theories, experiments, and practice of foreign chemists and dyemakers, all of which the court held, under section 4923, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3396], was not to be taken into account. It was shown as to some of these imperfect formulas, that, "if the blank be filled with a certain quantity of caustic soda, * * * the result will be water-soluble safranine azo naphthol; but, if the blank be filled with a certain larger quantity of caustic soda, the result will be water-insoluble safranine azo naphthol." The Court of Appeals held that to defeat the patent by reference to what had taken place in a foreign county—in other words, by showing that the art had information which would instruct the experimenter to "fill the blank" as Julius filled it—"reference must be made, not to the individual experiences of foreign dyestuff makers, nor to the un-

published theories of foreign chemists, but to the literature of the art —to the 'description in a printed publication' which the statute calls for." In view of this decision, such new testimony as deals with the unpublished theories, experiences, experiments, or practice of foreign experts should be disregarded. As to prior literature, not in evidence in the Kalle Case, each patent or publication may be separately examined.

### Agenda 1890 Article.

This was in the Kalle Case. It was quoted in the opinion, and found inapplicable because it dealt with formation of color on the fiber. It now appears that the concluding part of the Agenda article was not in evidence in the Kalle Case. It reads as follows:

"Brick reds may be obtained by treating the reds obtained from paranitraniline and from beta naphthylamine with a boiling bath of sulphate of copper, 2 grammes to the liter. By printing the thickened diazo derivative on the tissue prepared with naphthol and caustic soda, grounds with whites may be obtained. Similarly one may make reserves by printing upon the tissue prepared with naphthol and caustic soda a gum color containing 600 to 800 grammes of tin salts, and then padding with the diazo solution; now wash and dry."

Certainly there is nothing here at all calculated to modify the decision of the Court of Appeals as to the nonapplicability of this publication.

### Abel's British Patent of 1887.

This is too long to quote. All that is claimed for it in the testimony and briefs is that it showed the use of acetate of soda in forming azo colors in substance, and is an "instance of the common practice to try the solubility of azo colors in acid."

### Allen, Commercial Organic Analysis (1889).

This is not at the page given in the manuscript index, nor have I been able to find it. It is unnecessary to give any further time to it, since it is not referred to in the briefs of any of the counsel, nor indexed under the head "Anticipation by Literature," in the printed index, presumably because of its unimportance.

### Berichte, 15th Year (1882).

The part of this article which is deemed important is quoted in defendants' brief as follows:

"An acid solution of diazotized xylidine and aqueous solution of resorcine do not react upon each other even after standing for days. The reaction begins instantly, however, as soon as some caustic or carbonated alkali is added to the liquid," etc.

It is suggested that, according to this writer, caustic alkali and corbonated alkali are treated as known equivalents in the making of an azo phenol, to wit, xylidine azo resorcine, and a more advantageous result is obtained if sodium acetate be used instead of caustic alkali. Complainant contends that this publication has no relation to safranine azo naphthol, because resorcine is more analogous to the group of sulphonated naphthols. But conceding for this article what defendants claim, it does not change the situation. The Court of Ap-

peals, in the Kalle Case, held that it was known before Julius that "alkalinity might be produced by caustic soda or by carbonate of soda," but this 15th Berichte is as barren as was the literature before that court of any information as to the quantity of either which should be used to secure a water-soluble product. It fails to fill the blank, and, that being so, it cannot be assumed that its presentation to the Court of Appeals in the Kalle Case would have led to a different conclusion.

### Berichte, 17th Year (1884).

This refers to the production of oxy-azo bodies from phenols and diazo compounds, and shows the equivalency of caustic and corbonated alkalies for the purpose of inducing the reaction. It refers to the improvement which was obtained by substituting sodium acetate for caustic or carbonated alkali. This is substantially like the Berichte 15th, just referred to, and may be similarly disposed of.

### Benedikt and Knecht—Chemistry of Coal-Tar Colors (1889).

All that is claimed for the excerpt put in evidence by defendants is that it shows the use of tanno metallic mordant before 1891. It is not apparent that the Court of Appeals supposed it was not known before that date, and the bearing of this evidence upon the question now at issue is not apparent.

### The Chemical News (1890).

No expert seems to have testified as to this, but, so far as the court can make out from its text, it refers solely to dyestuffs of the sulpho-acid group, and which the Kalle Case held to be outside the pale of Julius' invention. The article refers only to beta naphthol disulphonic acid, to beta naphthol monosulphonic acid, beta naphthylamine disulphonic acid, and beta naphthylamine monosulphonic acid.

### Clark's British Patent of 1884.

The only proposition that it is claimed this reference tends to establish is that the use of acetate of soda in the formation of azo bodies in substance was then known. Such use, however, is mentioned only in connection with two sulpho-acid bodies.

### Forel Patent of 1888.

This was introduced by complainant. The only reference to it in defendants' brief shows that no reliance is placed upon it as anticipating or circumscribing the art. The same remarks apply to Wolff patent of 1888, and Greville-Williams patent of 1889.

### Faberwerke Two Circulars (1889).

These certainly would not have modified the opinion of the Court of Appeals, for they are expressly headed, "Production of Insoluble Azo Dyes Direct upon the Cotton Fiber"; and, as defendants' expert testifies, although they give a list of several shades, they make no mention of safranine azo naphthol. The same remarks apply to "Organische Farbstoffe," by Mohlan (1890), and to the Textile Colorist article of 1889.

### Friedlander Article (1888).

All the pertinence defendants claim for this is that it shows that the cost of azo safranine bodies before 1891 was prohibitive.   It relates, moreover, only to the sulpho acids.

### German Patent 51,331.

Complainant's expert, on cross-examination, read some excerpts from this patent.   After long search, I have been unable to find in the record any statement as to its date.   As it is not included in the index to briefs, presumably it is not deemed of much importance.

### The Hollidays' United States Patent 241,661 (1881).

This is for same invention as the English Holliday patent 2,757 of 1880, which was in evidence in the Kalle Case.

### Hoffman's United States Patent 332,528 of 1885.

This seems to deal solely with the sulpho-acid group.

### Kegel's English Provisional No. 13,408 of 1885.

It is not perceived that the excerpt from this which is introduced changed the situation from that made by the introduction of Kegel's French patent for the same invention, which was in the Kalle Case.

### Lauber's Handbook (1885).

This is a "Practical Handbook of Cloth Printing."   The article, as a whole, and even the excerpts put in by defendant, are too long to quote.   It may be noted that the production of dyestuffs, in substance, is an operation quite distinct and separate from cloth printing; also that the heading of that part of the book in which all the passages in proof are contained reads:   "Direct Development of Azo Colors on the Fiber."   Defendants' contention with regard to this reference is that it is particularly important in the three following respects: First, it gives facts of general interest in the formation of azo dyes; second, it shows the difference between preparing an azo dye in substance, and the production of the same dye on the fiber;   third, it describes the production of safranine azo naphthol.   The only production of safranine azo naphthol which it describes is Kochlin and Galland's prescription for forming it on the fiber, which was disposed of in the Kalle Case.   As to the second proposition, all that the article says is this:

"In the production of azo dyes in the color factory, it is customary to allow the diazo solution to run into the alkaline phenol solution.   In the production of the same dyes on the fiber this method is reversed.   The cloth, impregnated with the phenol, is run into the diazo solution."

As to the first proposition, it gives prescriptions and practical instructions as to the formation of azo dyes, but they all, so far as the article indicates, refer to formation on the fiber.   Besides the caption above quoted, the article within the four pages quoted by defendants states in so many words that it refers to production "on the fiber" no less than 12 times.   It seems entirely clear that, had this article been before the court in the Kalle Case, it would have been disposed

of as was the article from the Agenda, supra. Defendants' expert refers to a single sentence in this article as showing that before Julius the literature of the art had stated that unsulphonated safranine azo naphthol was soluble in water. The sentence reads: "The blue obtained according to Koechlin & Galland with safranine is absolutely not fast." This does not state whether it is "not fast" when tried with water, with soap, or with sunlight; and complainant calls attention to the circumstance that this very sentence was in an edition of Lauber's Handbook published in 1891, which was before the court in the Kalle Case.

### Depierre's Treatise (1890).

The date on title page is 1891, but defendants proved publication in 1890. Defendants' brief concedes that "this work gives a description of the Koechlin & Galland prescription for forming safranine azo naphthol," although the book itself does not give these names. As we have already seen, the prescription of these gentlemen related solely to production of the color on the fiber, and there is nothing in the article to indicate a formation of dyestuff in substance. On the contrary, its prescription reads: "One pads first with naphthol and caustic soda bath, containing [certain ingredients]; one dries, then passes * * * through a mixture of the three solutions following," etc. This is the method of dyeing on the fiber, and the Depierre is to be disposed of as was the Agenda reference in the Kalle Case.

### Nietzki Article (1883).

This is also referred to as "Berichte, 16th year." It is an article in a publication of the German Chemical Society entitled "On the Dyestuffs of the Safranine Series." Complainant's counsel, in both his briefs, asserts that it was before the court in the Kalle Case, but the manuscript list furnished after the case was submitted does not confirm this assertion, nor does it appear in the index of exhibits in the Kalle record. Complainant also contends that the article relates not to safranine azo naphthol, but merely to diazo safranine. Apparently this contention is not disputed. Defendants' brief admits that this article did not couple the diazotized safranine with naphthol. Be that as it may, what is claimed for the article is that it taught those skilled in the art (1) that the original chlorine atom of commercial safranine is not removed by caustic soda; and (2) that the said atom plays no part in the diazotization of safranine, for which purpose two additional molecules of hydrochloric acid are therefore theoretically necessary. Conceding that such is its teaching, the article certainly does not state that safranine azo naphthol is soluble in water, nor does it give such instructions for filling the blank in existing formulas for its production as would result in a water-soluble product.

### Nietzki and Otto in 21st Berichte (1888).

Refers only to tests for safranine.

### Poirrier & Rosenstiehl United States Patent 390,327 (1888).

This is for the production of azo colors in substance. Defendants call attention to the fact that it mentions carbonate of soda with both

the sulphonated and unsulphonated naphthols. It is difficult to see upon what theory it would have induced a different conclusion, had it been in the Kalle Case, in view of its statement:

"All the coloring matters described in this specification are soluble in water, with the exception of that from alpha naphthol and from beta naphthol; but, by treating these with sulphuric acid according to known processes, they are obtained in the state of soluble sulpho combinations."

This seems to be in complete accord with what the court in the Kalle Case understood to be the state of the art.

### Roussin Patents (1878, 1879).

These are United States patents 210,054, 211,525, 211,671. I have not been able to find testimony of defendants' experts explaining these patents. The first seems to deal with the sulphonated group, for the specification states that the coloring matters sought to be patented are obtained "by the reaction of the diazoic derivative of sulphanilic acid upon the amines," etc. The second, as stated in defendants' brief, deals with "the formation of an azo body on the fiber." Of the third, it is stated that it "shows the coupling of alpha naphthol (but not of beta naphthol) in a nonalkaline bath." The bearing of this fact is not apparent.

### Roscoe & Scharlemmer Treatise (1886).

All that is claimed for this is that it shows "that in safranine the chlorine atom is held even against alkalies by a strongly basic group, which can neither be diazotized nor acetylized."

### Reissig Patent (1890).

A United States patent (No. 431,541), the relevant parts of which apparently deal only with fluorescence test, which is discussed infra, under the heading of "Infringement."

### Stebbins United States Patent 221,114 (1879).

This shows the production of a yellow-brown dyestuff, of which it is stated, "It is not soluble in water, but by converting it into a soda salt or sulpho salt it is rendered soluble in water." Certainly the presence of this patent in the Kalle record would have made no change in the result.

### Vancanceine Blue of Holliday (1891).

This is referred to subsequently under the heading of "Alleged Prior Uses."

The following references are apparently not discussed anywhere in the briefs, and, so far as the court has been able to ascertain, not in the expert testimony. They are not given in the index to briefs, and need not be here discussed; each has been examined and appears to be unimportant: Lieberman, Berichte, 16th year (1883); Berichte, 20th year (1887); Witt & Deslichen, Berichte, 21st year (1888); Fehling's Handwortenbuch (1890); Homolka United States patent 418,916 (1890); Richter Organic Chemistry (1885); Textile

Colorist (1884); Villon, Traite Pratique (1890); Weinbourg United States patent 426,345 (1890); Williams United States patent 11,016, reissue (1889).

Subsequently, under the discussion as to alleged prior uses, will be found the reasons for taking the de jure date of the patent as March 13, 1891. That disposes of the following references: Chemical News (1896); Dyer article (1893); Farbenfabriken German patent 95,483 of 1897; Faberzeitung of 1898; Janbert article (1895); Knecht, Rawson & Lowenthal's Manual (1893); Lehne's Faberzeitung (1891; the date is given only as 1891, and defendants have not shown it was published prior to March 13th of that year); Lefevre, Matiers Colorantes (1896); Shultz & Julius Tables of 1894, 1896, and 1897.

### Alleged Prior Uses.

In the Kalle Case there was no evidence of any prior use in this country. In the case at bar testimony as to three such uses was taken. Of these the latest in point of time is referred to as the Read Holliday & Sons experiments at their laboratory in Williamsburg. The character and extent of this alleged "use" need not be discussed, since the testimony does not bring it back of June, 1891. The defendants' brief states it "as early as June, 1891, if not before," but there is nothing to show it was earlier than the date given. When the patent was before the Circuit Court, it was held that the de jure date of the invention was January 2, 1892, the date of the English patent. Upon appeal both sides acquiesced in this finding, so the Court of Appeals took that date as marking the boundary between Julius and the prior art. Since the decision of the Circuit Court in the Kalle Case, however, the question of de jure date of an invention previously patented in a foreign country was before the Court of Appeals in the Second Circuit, which held:

"As against an infringer, the patentee in a United States patent for an invention previously made by him and patented in a foreign country may, to avoid alleged use in this country by an infringer, before the date of the foreign patent, show the date of the application for the foreign patent, for the purpose of showing the actual date of his invention in a foreign country." Welsbach Light Co. v. American Incandescent Lamp Co., 98 Fed. 613, 39 C. C. A. 185.

The date of application for Julius' English patent is March 13, 1891, which eliminates this alleged Read Holliday & Sons' use of June, 1891.

The same concern, some time in 1890, had been using a dye which resembled the dyestuff of the patent in suit in some particulars, but there is no proof that it was safranine azo naphthol in any form. Apparently defendants do not rely on this alleged use, for with regard to it their brief contains this statement only:

"Defendants were unable to trace out the anticipation. Whether the evidence is or is not sufficient to show a direct anticipation, it shows that Julius was not the first to make a blue color soluble with hydrochloric acid in order that it might be used to dye on a tanno metallic mordant."

The last proposition, if conceded, would not defeat the patent, and the evidence is wholly insufficient to show an anticipation. One wit-

ness only testified to the transaction, from his unaided memory of 10 years before, and his statements were vague and unpersuasive.

Considerable testimony was taken as to an alleged prior use in 1889 at the Merrimac Printworks, in Lowell, Mass. The experiments testified to were unsatisfactory to those making them, and consequently were abandoned. The dyestuff, moreover, was produced on the fiber—a circumstance which in the Kalle Case was held sufficient to eliminate an alleged anticipating publication which was greatly relied on. But it seems unnecessary to discuss these experiments at any length, since the only reference to them in defendants' brief is that they "tend to show that it is impracticable to make safranine azo naphthol insoluble."

### Sufficiency of Description.

It is further contended that the description given in the patent of the manner of carrying the invention into effect is insufficient. The specification calls for safranine T, 7 parts; sodium nitrite, 14 parts; and other ingredients. As shown by the testimony, this prescription, expressed in molecules, is as follows: Safranine T, 1 molecule; sodium nitrite, 10.14 molecules, etc. Nevertheless the specification states that the 14 parts of sodium nitrite amount to one molecular proportion. There is manifest error somewhere. Complainant's expert corrected it by reading 1.4 parts instead of 14 parts of the sodium nitrite; but defendants ask, and not without reason, why, in the state of knowledge of the art when the application was prepared, one should change the figures "14 parts" to "1.4 parts," instead of changing the words "one molecular proportion" to "10 molecular proportions." We need not go into any discussion of possible corrections. It appears by the testimony of both complainant's experts that "if one employs ten molecular proportions of nitrite of soda, instead of one molecular proportion, one still obtains the water-soluble safranine azo naphthol of the patent." There is, of course, more waste, and consequently greater expense; but it cannot be said that the specification, read either way, fails to show one skilled in the art how to make water-soluble safranine azo naphthol.

### Julius' American Patents.

It is contended that the patent in suit is void by reason of certain other patents issued to Julius on the same day. These patents are United States Nos. 524,251, 524,252, 524,253; the patent in suit being 524,254, and all four of them issued on August 7, 1894. No. 524,-251 contains a single specific claim for the specific indoin blue obtainable from safranine proper and alpha naphthol. No. 524,252 contains a single specific claim for the specific indoin blue obtainable from dimethyl safranine and beta naphthol. No. 524,253 contains a single specific claim for the specific indoin blue obtainable from dimethyl safranine and alpha naphthol. The fourth claim of the patent in suit is for the specific indoin blue obtainable from safranine proper and beta naphthol. The second claim, as already construed, is generic, and covers all these four varieties. As defendants' brief expresses it:

"The distinction between the four patents is based upon the division between safranines proper and substituted safranines, on the one hand, and

between alpha naphthol and beta naphthol, on the other. All four combinations are set out in [the specifications of] each of the four patents; but the first three [patents] are restricted in their several claims to the combinations of the safranines of the first of the two divisions with alpha naphthol, and of safranines of the second division with both alpha and beta naphthols, whereas, the patent in suit, in addition to claiming in claim 4, the combination of safranine proper with beta naphthol, claims in claim 2 the combination of any safranine of either division with naphthol in either of its forms."

Of course, the more logical way would have been to include the genus and its various species in a single patent, avoiding thus what seems to be an unnecessary multiplication of patents. But the rules of the Patent Office do not allow any such simplification, permitting in a single application only a generic claim and one specific claim, and requiring all other specific claims to be each the subject-matter of a different patent. It would be a failure of justice if the patentee of a meritorious invention should be deprived of the fruits of his labors because an arbitrary rule of the Patent Office has brought about complications not contemplated, if authority can be found for securing it to him. Such authority is not wanting in this circuit, where it has been held that an inventor has the right by contemporaneous applications to a generic and specific patents, and that when he has thus applied he shall not lose his generic patent because one of or more of the specific patents may happen to be issued first. Electrical Co. v. Brush Co., 52 Fed. 137, 2 C. C. A. 682; Thomson-Houston Co. v. Elmira Co., 71 Fed. 396, 18 C. C. A. 145; Thomson-Houston Co. v. Hoosick Railway Co., 82 Fed. 461, 27 C. C. A. 419. Julius was careful by cross-references in the documents themselves to indicate the relations of his generic and specific patents.

The defendants, however, contend that the applications for generic and specific patents were not contemporaneous. The facts are as follows: On April 21, 1892, four applications were filed. Of these, Nos. 430,111, 430,112, 430,113 are the ones on which the specific patents were subsequently granted. The history of the other application is this: As will be seen from the Kalle opinion and what has been written supra, the generic invention of Julius was an unsulphonated water-soluble safranine azo naphthol dyestuff—an article not known before to the art, and which was patentable, however it was produced. He also discovered two processes for producing it (both patentably novel), known as the "acid process" and the "washing-out process." Seemingly he first discovered the acid process, for we find it mentioned in his application for the English patent, but no mention of the washing-out process until a later period. Apparently he knew only of the acid process when he filed application No. 430,110, on April 21, 1892, for it says nothing of the other process. In other respects this application conformed substantially to the specification of the patent in suit. It contained a generic claim, and a specific claim for the product of safranine proper and beta naphthol, and a claim for the process. Subsequently becoming acquainted with the washing-out process, he sought to incorporate it, and on March 22, 1893, filed a communication by which the application was "amended by canceling the entire specification, with the exception of the caption and signatures, and substituting therefor" a new specification,

which sets forth both the processes, but still contains the generic claim and the "beta" specific claim.   For reasons which are not testified to, but which may readily be conjectured, it was thought better to make a new application, setting forth both processes under the inventor's oath.   This was done April 1, 1893.  ·The new application, which is No. 468,691, and on which the patent in suit is issued, sets forth both processes, and contains. the generic and the "beta" specific claims.   The Supreme Court, in Godfrey v. Eames, 1 Wall. 324, 17 L. Ed. 684, says:

"A change in the specification as filed in the first instance, or the subsequent filing of a new one, whereby a patent is still sought for the substance of the invention as originally claimed, or a part of it, cannot in any wise affect the sufficiency of the original application, or the legal consequences flowing from it.   To produce that result, the new or amended specification must be intended to serve as the basis for a distinct and different invention, and one not contemplated by the specification as submitted at the outset."

If the generic claim here is not for the process, but for the new article, however made, which is formed of designated components and responds to designated tests, the later and the earlier applications will be treated as continuous, for the purpose of saving the patent from the effect of an earlier issue of a specific patent.   That such is the construction of the claim was held in the Kalle Case.

Infringement.

The proof as to infringement may be next considered.   On December 31, 1895, on the employment of the agents in this country of complainant, one Pollman went to the regular place of business of A. Klipstein & Co., and asked for "one pound blue for cotton, the same color what Kalle & Co. sell here under the name Bengaline Navy Blue."   He was given one pound cotton navy blue in a can, with instructions for use.   On May 9, 1899, Pollman made another purchase, making the same request, and being supplied with another one-pound ·can of Klipstein's Cotton Navy Blue; a receipted bill being given with the same, but no instructions as to use.   The contents 'of both cans were carefully traced to the hands of complainant's expert.   Defendants suggest that long delay in prosecuting should induce the court to disregard the sale in 1895.   But it appears that the delay was solely to await final decision in the Kalle Case, which was not only excusable, but commendable.   It is objected that there is no proof connecting any of the defendants with this sale.   A. Klipstein & Co. is a corporation, and proof of a sale made by a person found in its regular place of business, apparently engaged in his ordinary occupation, and who makes statements as to method of use which are appropriate to the sale of such material, is certainly prima facie evidence of a sale by the corporation.   The defendants put in no evidence to controvert Pollman, or repudiate the employment of the persons who sold him the cotton navy blue.   Proof of a sale by the corporation is therefore shown, but there is no proof connecting E. C. Klipstein personally with the transaction.   He is an officer of the corporation, but, in the absence of specific proof of personal participation in infringement, should not be singled out for a separate decree.

Defendants contend that it is nowhere shown that the A. Klipstein

& Co. from whom the dye was purchased is the A. Klipstein & Co., defendant in the suit. This objection is wholly without merit. It appears from the pleadings that the defendant A. Klipstein & Co. is a corporation doing business in the city of New York, and that E. C. Klipstein is an officer thereof. Pollman bought dyestuff from A. Klipstein & Co., at 122 Pearl street, New York City. Defendants called one Van der Menlen, a clerk, who testified that he was in the employ of A. Klipstein & Co., at 122 Pearl street, New York City. He produced books of his employer, from which he read the market price of safranine for several years prior to 1893. E. C. Klipstein, a defendant, and an officer of defendant company, was shown the same books, and testified to the correctness of the figures given therefrom. To suggest, in the face of this testimony, that there are two corporations or firms named "A. Klipstein & Co." at 122 Pearl street, one of whom sold dyestuff to Pollman, while the other employed Van der Menlen, is absurd.

Defendants further contend that the sales were not infringements of which a court of equity should take notice, because, being made to its agents, it was as though Badische Anilin had bought the cans; that the dyestuff was not sold to a person who intended to dye with it; and that sales to a patentee are licensed sales. A similar objection was overruled by this court in Chicago Pneumatic Co. v. Phila. Tool Co. (C. C.) 118 Fed. 852, where it was held that, although a complainant might not be able to recover damages or profits for such a sale, it was nevertheless an infringement, entitling complainant to injunctive relief. Moreover, when two such sales on different dates are proved, the seller apparently supposing that the purchaser was buying in the regular course of business, and delivering the goods from a stock on hand, and no evidence whatever to contradict or explain is produced by defendant, the facts proved are broad enough to support an inference that other similar sales have been made—sufficiently so to warrant a decree (the evidence on other points being satisfactory) for an accounting as well.

There is no proof as to the process by which the dyestuff sold to Pollman was made. In the Kalle Case, however, both courts held that the patent was for a product, irrespective of the process by which it was made, and found infringement in an article which responded to the tests prescribed in the claims. The same construction should be followed here; but, even if this court were not controlled by the earlier decisions, and were persuaded that infringement could be predicated of a product which responded to those tests only when it was produced by the processes of the patent, the complainant's right to relief, upon the record in this case, would not be affected. The prior discussion in the Kalle Case and in this has resulted in the conclusion that Julius was the first to give to the art an unsulphonated water-soluble safranine azo naphthol, and was the first to point out two ways in which it might be produced. The washing process, only, was discussed at length in the Kalle Case, but the acid process, as well, was held to disclose invention. How a chemical product is made is a question which the maker alone can answer with absolute certainty. All the experts in the world, if they did not

see it made, could testify only to inferences based upon their acquaintance with the literature and practice of the profession. Two ways, and two ways only, to produce the product defined in the claims of the patent, are shown to be known to the art. Its literature has been ransacked. In the Kalle Case and this together nearly a score of experts, many of them men of the highest attainments, not only in the art generally, but also in this branch of it, have been examined and cross-examined, and no process other or different from the two described in the patent has been indicated. Were such other process known, it is unthinkable that in this enormous mass of testimony there should be no hint of its existence. If, then, complainant shows that the product is within the definition and responds to the tests of the claims, and nothing further appears, it is a legitimate, and, in the state of the record, an irresistible, inference that it was produced by one or other of the indicated processes. If defendants have discovered some new process, which they wish to keep as a business secret, a court might not compel them to divulge it, but they could at least show by affirmative proof that some one or more steps (or all the steps) of the processes set forth in the patent had not been followed in the manufacture of the product. In the absence of any such proof, complainant would establish a prima facie case of infringement, even if the process were read into the product claims.

The contents of the two cans purchased by Pollman were submitted to Dr. Henry Morton for chemical analysis. He testified on the direct that he had examined and tested the coloring matter taken from them, and that it substantially consisted of the coloring matter claimed in claims 2 and 4 of the Julius patent in suit; one of the cans, however, containing a mechanical admixture of the dyestuff known as methylene blue. No expert was called by defendants to show that their cotton navy blue dyestuff would not respond to the tests of the patent, or that it was not in fact a water-soluble safranine azo naphthol. They confined themselves to an exhaustive cross-examination of Dr. Morton, in the course of which he set forth in detail the tests by which he satisfied himself that defendants' dyestuff was substantially that of the patent. Briefly stated, these were the tests: (1) He placed a gramme of the dyestuff in 100 grammes of water, with the result of a solution without precipitate. (2) He stirred a few grains of the dyestuff in a little sulphuric acid, whereupon the sulphuric acid assumed a blackish-green color. (3) He took fiber mordanted with tannin and tartar emetic, and introduced it into a solution of the dyestuff. It is unnecessary to give the details. The fiber was first dyed, and then tested by washing in a soap solution, about such as would be used in a laundry. The same piece of fiber was hung up in a window, partly covered, and showed no fading after exposure for several days. (4) He treated another portion of the dyed fiber by zinc dust and acetic acid—a "well-recognized reducing agent"—whereupon the red color of safranine was developed. (5) He treated another portion with caustic soda, and obtained a brown color in solution, which, on addition of a salt of iron, turned black—a result known to chemists as the "tannin reaction." (6) He treated another portion with dilute hydrochloric acid and sulphureted hydro-

gen, securing "the characteristic orange precipitate of sulphide of antimony"—a metal. (7) He treated a portion of the dyestuff itself with zinc dust and acetic acid, thereby obtaining a red color, which, on pushing the reduction, disappeared, but quickly reappeared on exposure of the solution to air. (8) He mixed a small portion of the red liquor from the last test with alcohol, and observed the color by reflected light; the color exhibited being a delicate yellow tint, which he says is a fluorescence characteristic of safranine. (9) He reduced the dyestuff with stannous chloride and hydrochloric acid. The process is too long to quote, but it resulted in a precipitate of a perfectly white color. By observing the behavior of this substance during the operations, and by applying a test of perchloride of iron, he reached the conclusion that it was alpha amido beta naphthol, which is one variety of amido naphthol.

Now, if the three claims of the patent be referred to, it will be seen that the above enumeration includes every test which is set forth therein. The expert was a chemist of high attainments and large experience, fully competent to conduct the various technical processes of the laboratory by which such tests are made. He was cross-examined at great length, and gave the detail of those processes. The court is wholly without the professional knowledge which would enable it to decide whether those processes were conducted in conformity to scientific methods. Upon the borders of the vast wonderland of chemistry it must perforce wait till some one skilled in the intricacies of that science and art appears to lead the way through its labyrinth of terms and symbols. No expert was called by the defendants to show that, in this, that, or the other particular, Dr. Morton's tests were improperly conducted. No expert testified that he had himself applied the tests of the claims to defendants' dyestuff, with some other or different result from that obtained by Dr. Morton. No expert was called to show that the residuum which Dr. Morton satisfied himself was amido naphthol was really something else, or that the residuum which he satisfied himself was safranine was not safranine at all. An elaborate and highly technical argument is presented in the briefs, directed to prove this; but, beyond merely elementary propositions, the court cannot take its chemistry from counsel. The obscure actions and reactions of chemical processes require for their comprehension the study and investigation which qualify the expert, and the expert's statement should be given as other evidence is, with full opportunity for cross-examination. It is contended that, upon Dr. Morton's own showing, he did not sufficiently establish that the red color (see test 7, supra) was safranine. It is insisted that safranine is not the only substance with a disappearing and reappearing red color. The witness, it is true, admitted that there are many coloring matters of various shades which lose color on reduction and regain it on oxidation; but he added that, so far as he knew, "safranine is the only color which can be obtained from a blue dyestuff, which on gradual reduction first becomes red, then colorless, recovering its color on exposure to the air." It may be admitted that probably there were dyestuffs or colors in the world which the witness had never seen or heard of, but, when a competent expert witness has given such testi-

mony as is above quoted, the identity of the red color of the test with safranine is made out prima facie. If there are other colors which will give the same results, it is for the other side to show some reference to them in the literature, the experiments, or the practice of the art. The complainant is not required to eliminate by affirmative proof every other substance in the universe. Moreover, the witness applied an independent test (the fluorescence test, No. 8, supra) which indicated that the red color was safranine, as to which test there was no cross-examination. The only criticism which the brief makes on this test is found in a dozen lines. It is asserted that Dr. Morton did not lay any stress on it, and that it is not recited in the patent. Dr. Morton did assert that the delicate yellow tint displayed was characteristic of safranine, and the fact that the patent does not mention it is immaterial. What the patent says is that upon a certain reduction "a safranine is produced." How the experimenter shall establish the fact that the residuum produced by such reduction is a safranine, the patent does not undertake to provide, and any test approved by skilled experts may therefore be employed. Two other facts are mentioned in the brief: That naphthalene red dissolves very readily in alcohol, with a bluish-red coloration, the dilute solution exhibiting a magnificent cinnabar red fluorescence, and that the ethereal solution of Reissig's red-colored bases exhibits a yellow fluorescence. It is not perceived in what way these facts affect the conclusions which Dr. Morton drew from his fluorescence test. If he had never made the disappearing color test at all, it would seem that the identity of safranine was sufficiently established by this fluorescence test. There is no controverting evidence whatsoever in the record. The court feels entirely confident that defendants' dyestuff is the dyestuff of the patent. If it were not, complainant's prima facie case as to infringement might have been utterly demolished in a dozen pages of affirmative proof. The circumstance that defendants have chosen instead to devote their energies, at great cost of time and labor, to elaborate and refined criticisms of complainant's proof, is persuasive to the conclusion that it was the only thing they could do.

Under the authority of the Kalle Case, the sale of the dyestuff of claims 2 and 4, with instructions such as were furnished to Pollman on the occasion of his first purchase, constitutes an infringement of claim 1.

Complainant may take the usual decree for injunction and accounting as to claims 1, 2, and 4.