Booth, Chief Justice,
delivered the opinion of the court: This is a suit brought for recovery from the United States for the manufacture and use of certain high-explosive shells and fuse inventions covered by the following Isham patents:
#1179105, issued April 11, 1916
#1188178, issued June 20, 1916
#1237909, issued August 21, 1917
The original petition in this suit was filed on May 23, 1918, by the original plaintiff, Clara H. Isham, since deceased, to whom the patentee, Willard S. Isham, had assigned the above-mentioned letters patent. The said Clara H. Isham became deceased on or about April 21, 1925, and the claim now sued upon is one of the assets of her estate, the suit being continued by the husband of the decedent, Willard S. Isham, an executor, an amended petition being filed under date of January 21, 1926.
The record is most voluminous and contains 191 exhibits, making a record of a character which throws a heavy burden on the court in order to arrive at the proper judicial determination of this case.
It appears from the record that Willard S. Isham, the patentee, has had considerable experience in the art of high explosives, and that since 1899 he has been more or less in contact with the various Government officials interested in ordnance development, in having trials and experiments made with respect to his various theories and designs. In 1899 Isham conceived the idea of the use of an explosive in a shell of a nature sufficiently insensitive to withstand the shock to which the shell was subjected when the same was fired from a gun, but still sufficiently sensitive in character to explode when the shell, in the course of its trajectory, impacted with the target. Certain experiments with this •early design were carried out by the War Department during the period from 1899 to 1903. Some of these shells were fired successfully, while one shell exploded prematurely in the gun from which it was fired.
It was this early work of Isham which apparently ultimately led to the conception of the fuse construction and shell set forth in the three patents in suit.
*37 On May 12, 1914, the first of the three applications whicfy materialized into the three patents in suit, was filed in the Patent Office and subsequently Isham took up the matter of his fuses with the Navy Department, with the result that a board, known as the Fiske Board, was organized by order of the Secretary of the Navy on October 2, 1914, to investigate and report upon the value of the Isham shell and fuse for naval purposes. Isham disclosed to this Board the drawings and descriptive portion of his previously filed applications, but withheld from them the claims or portion of his application which specifically defined the patent monopoly that he was striving to obtain in the Patent Office.
As given in detail in findings VII to XIII, inclusive, there were numerous meetings of the Fiske Board, various ideas and sketches being submitted from time to time by Isham, experimental firing tests conducted, the entire story being the usual one of mixed failures and successes which always go with the development of a complicated mechanical device. The Board ended its work with the recommendation that the Navy Department acquire from Mr. Isham such of his rights as were essential in the development of the shell and fuse? “ and proceed with such development with all due expedition.”
From a review of the facts outlined in findings VII to XIII, inclusive, two cogent observations appear, the first" being that while the Navy Department was paying the costs of this experimentation, Isham nevertheless did not see fit to disclose to the Navy the terms of the patent monopoly that he was attempting to obtain, and the second being that while the Fiske Board felt that Isham might have something of value it was not yet perfectly developed, and more development and experimentation were still necessary. In plain language, it appears impossible that there could have been any real meeting of the minds with respect to the “ rights ” which Isham wanted to sell or the Navy wanted to purchase from him.
Following the tests of the Fiske Board, certain tests were made of the Isham fuse shown in figs. 1 and 2 of the Isham patent in suit, no. 1237909, by the Navy Department under authority of Ralph E. Earle, then Chief of Ordnance.
*38 Plaintiff maintains that a contract was then entered into with the Government for the development of a fuse, but he has failed to produce any such contract, does not know who signed it on behalf of the Government ? and the Government official, Captain Earle, with whom he was dealing, is equally positive that there was no such contract.
We fail to find any satisfactory evidence that any contract was entered into between plaintiff and defendant. (See finding XVIII.)
Plaintiff pleads in the alternative form that because of the circumstances outlined above there exists an implied contract, but if not, plaintiff is entitled to recover under the patent act of June 25, 1910, for unauthorized use of a patented invention. Plainly, these two positions are antagonistic and inconsistent. The plaintiff protests that the Government had no right to use the patentee’s devices, and at the same time pleads an implied contract, which carries with it a consent to use.
See Brothers v. United States, 52 C.Cls. 462, 467.
Rusell's case, 182 U.S. 516.
We accordingly take up for discussion the three patents in suit, as regards their validity and alleged infringement by the Government, as pleaded under the Patent Act of 1910.
Isham patent #1179105
The structure which is made the basis of this patent is a device adapted to be inserted in the nose or head of a high-explosive shell. The structure is stated by the plaintiff to be capable of exploding the shell in three different ways: First, instant explosion when the shell equipped with this fuse strikes a heavy target such as is typified by the heavy armor on battleships, having sufficient resistance to break up or seriously deform the shell; second, a substantially simultaneous explosion after the shell impacts with less heavy armor; third, the shell after impacting with a very light target offering resistance equivalent to water, explodes after a predetermined delay. Fig. 1 of the patent in suit, which is one of the sectional illustrations of the preferred embodiment, is appended herewith. The same comprises a *39 cylindrical body having at its lower end a detonator chamber 11, which the patentee states is intended to contain “ a semi-insensitive explosive.” As the exact character of this explosive appears to be material in this case, we quote from page 2 of patent #1179105 in suit the following subject matter relative to this semi-insensitive explosive:

“ Typical explosives of this character are guncotton, •carrying a large percentage, say 10 percent, of water; explosive gelatin, containing a large percentage of camphor; or any other suitable explosive that will be exploded by a violent shock sufficient to seriously deform or break up the shell, hut which will not explode by shock when the shell strikes water or other material offering approximately the same or less resistance, and which will not of course be exploded *40 by the lesser shock incident to firing the shell from a gun.. The exact degree of insensitiveness required in the explosive contained in chamber 11 is of course variable with conditions of service, depending among other things, upon the size of shell used, the dimensions and shape of the chamber in which the explosive is contained, etc. As these conditions are well known and understood by those skilled in this art, the designing of the semi-insensitive charge to meet any given requirement is a simple matter.”
Located above this chamber is a second chamber 9 formed to receive a charge of relatively insensitive explosive, such as black powder. A tit or hollow tubular member 14 projects downwardly into this chamber, its interior being filled with a compressed powder or delay train. A primer, or percussion cap 27, is located in an inertia member or hammer member, a passageway from this primer or cap leading into a central member and forming a communication for the flame of the percussion cap to the delay train. The inertia member which carries the percussion cap is capable of a ro-tative movement, which movement is imparted to this member when the shell is fired from the gun so that the primer is rotated from an unarmed position to an armed position, in contiguous relationship with the fixed firing pin against which the primer impacts when the shell strikes a target of any character whatsoever. A sequence of explosions is initiated when the shell strikes a body of water or a target of similar resistance, by the primer contacting with the firing pin, the flame from the primer passing into the central passageway and igniting the top of the delay fuse, which after burning a predetermined time ignites the black powder beneath it, which in turn explodes the guncotton detonator, which in turn explodes the main charge of the shell.
If the shell, however, hits the target offering more resistance, the projecting end of a center pin 19 is driven inwardly and the lower end of this center pin cuts or punches out the tit carrying the delay train so that the flame from the primer is communicated directly to the black powder charge and therefore a substantially instantaneous explosion will result.
When the shell impacts with a heavy target of sufficient strength to deform or break up the shell, it is the expressed *41 intention of the patentee to so select the degree of sensitiveness of the detonating charge that it will be detonated or exploded irrespective of the above-described mechanical fuse action.
Isham patent #1188118
This patent relates to a shell designed referred to as a “ diving shell.” Fig. 1 of the patent in suit is herewith shown:

One of the features of the invention is to provide the inner walls of the shell with a series of annular ribs which tend to support the explosive and to segregate the pressure shock on the firing of the shell into a plurality of separate zones, thereby decreasing the setback pressure which would otherwise exist on firing at the base of the chamber. Another feature is the use of a cup-shaped nose. This is intended to catch the water and provides a downward thrust to the shell, causing the same to dive instead of ricocheting along the surface of the water. The specification makes no disclosure of the constituency of the semi-insensitive explosive to be used in this shell, nor does it give any data to the man skilled in the art as to the weight of the shell, the firing pressure to be used, or the ranges to be employed. The suggestion, nondirectional in character, is made with respect to the fuse to be used that—
“ If the shell is provided with a suitable delay fuse arranged to be set -in action by retardation of the shell in flight, such, for example, as that disclosed in my copending application serial no. 838119, filed May 12, 1914 (patent no. 1179105), the shell thus becomes a mine adapted to explode at a calculable depth below the water and a definite time after striking the same.”
*42 Isham patent #1237909
The structure disclosed in this patent is substantially similar in its method of functioning to that shown and discussed in connection with Isham patent #1179105, and also involves the use of a semi-insensitive detonator sufficiently sensitive to explode on impact with a heavy target but sufficiently insensitive to withstand the shock of firing from the gun, in this connection mentioning the use of a fulminate of mercury, although the patentee does not specify the degree of compression under which the fulminate of mercury is loaded in the detonator capsule, thus omitting to state the degree of' sensitiveness of the detonator.
The feature which distinguishes this patent from the patent #1179105 is that it provides a safety chamber in which the fulminate-of-mercury detonator is normally located. This detonator is mounted in a rotatable inertia member having screw threads upon its exterior, and by virtue of these and the inertia effect caused by the spinning of the shell due to the rifling of the gun, the detonator capsule is automatically moved from its normal position in the safety chamber back into operative relationship with the booster charge.
The double illustration (p. 43) which is taken from figs. 1 and 2 of this patent, shows the detonator in the top figure as located in normal position in the safety chamber and in the lower figure in the position assumed after the shell has been fired and the rotational effect imparted to it by the rifling of the gun has caused the screw-threaded carrier to move the detonator capsule to the rear and into the midst of the bursting charge. In this patent, as in the former patent, #1179105, the patentee expresses the intention of using a detonator which will explode directly by the shock of impact when the shell hits a heavy target, and it therefore is not dependent upon the mechanical coaction between the firing pin and a priming cap. In this regard we quote from patent #1237909:
_ “ Said detonator charge is of such character that explosion thereof in detonating relation to a booster charge or to a burster charge will detonate said booster or burster. Said *44 detonator charge is here shown as automatically movable by set-back from nondetonating into detonating position. It comprises in the present example a column 70 of fulminate of mercury of such length and arrangement that it cannot ex-XDerience a shock of sufficient intensity to explode it except by impact of the projectile in flight against solid material. This fulminate charge may be inclosed in an extremely thin brass casing 71 of negligible strength, the capsule thus formed being located in a suitable chamber provided in the interior of a movable carrier member 72 which is most desirably made of bronze. The forward end of casing 71 is provided with a thin closure 73, of rubber, for example, the closure being provided with a central vent opening 74. A thin covering 75 such as silk gauze is also provided and loose powder may be placed on this gauze covering. The amount of fulminate, fulminate mixture, or other detonating material employed and the dimensions of the detonating column naturally vary in practice, these details being dependent upon several factors such as the size of the shell, and its design. For a 12-inch shell weighing approximately 750 pounds, I have found that the requirements are satisfactorily met by a capsule of the form here illustrated having a length of about one inch and a diameter sufficient to carry 30 grains of fulminate of mercury. These dimensions are to be understood as merely typical and not as restrictive.”

*43

*44 THE ALLEGED INFRINGING GOVERNMENT STRUCTURES
There are seven different Government structures which are alleged to infringe one or more of the Xsham patents in suit. They are as follows:
Mark II fuse
Mark III fuse (2 forms)
Mark IV fuse
Mark Y fuse
Mark YII fuse
Mark III bomb fuse
Navy F-N diving shell
The Mark II fuse is a point detonating fuse for use with high-explosive shells. The fuse consists of a tubular casing which is screwed into the nose of the shell and contains at its mid portion an annular booster charge. The upper portion of the casing has fixed at its upper interior extremity a firing pin, and the lower end of the casing, which is reinforced, forms a safety chamber. The movable portion of *45 the fuse construction consists of an elongated striker rod which is centrally located in the casing and passes through the opening in the booster charge, carrying at its lower end normally located in the safety chamber a detonating charge of fulminate of mercury. The upper end of the striker rod carries a primer, the striker rod being provided with an axial opening so that there is a passageway between the upper primer charge and the lower or detonating charge. The striker rod is locked in this normal position by means -of a safety plunger. When the shell is fired, the centrifugal force produced by the spinning of the shell causes the safety plunger to move outwardly and unlock or free the striker rod for subsequent axial movement. When the shell is retarded by its impact against the target the striker rod overcomes the frictional effect of a brass split ring and moves forward, •causing the primer to contact against the firing pin, the resultant flame traversing the communicating passageway to the detonator, which is thus exploded and which by reason of the forward axial movement of the striker rod is now located within the annular booster charge. An explosion, ■of this and the main charge of the shell consequently ensues. This fuse in its second form is adapted to be loaded for a ■delay action by inserting a delay charge or pellet in a communicating passageway between the primer and the detonator. This fuse is therefore adaptable to delay or non-■delay action in accordance with the way it is loaded or prepared.
The Mark III fuse is a type of fuse construction designed ■for the specific purpose of producing a superquick or instantaneous explosion of the shell with which it is associated when the shell strikes its target. To accomplish this feature the fuse consists of an elongated hollow member which projects several inches beyond the nose of the shell and carries at its forward end a firing pin which explodes a primer upon .contact with a target, thus initiating the explosion of the ■shell before the body of the shell itself reaches the target. Premature operation of the firing pin is prevented by a pair of half rings held in place by a brass spiral which is unwound .and releases the rings due to the spinning of the shell after .the same has been fired. A fulminate-of-mercury detonator *46 is located adjacent the primer cap, and the flame from this passes down through the hollow tubular 'member of the fuse and detonates a lower detonator located within the-body of the shell and surrounded by a booster charge. In. one form of this shell a safety plunger was utilized which prior to firing closed the flame channel so as to prevent premature explosion of the lower detonator and shell charger in case of premature explosion of the primer. This type of fuse which was used in various sizes of high-explosive shells has no safety chamber and no form of delay action.
The Mark IY fuse comprises a nose fuse carrying at its' outer end a fixed firing pin which contacts with a primer carried on the forward end of an axially slidable interior plunger, which is normally locked in place against movement by a safety finger engaging a shoulder on the plunger-Upon firing of the gun the setback disengages the safety finger, leaving the plunger free to move forward against the firing pin upon impact of the shell with the target. When the primer is thus fired the flame passes through an interior flame channel to a delay-fuse pellet, which after burningexplodes a charge of black powder and in turn explodes the-fulminate detonator. This fuse is adapted for loading both with delay and nondelay action, the nondelay action occurring when the fuse is constructed without the delay-action pellet, so that the flame from the primer may directly and-instantaneously ignite the fulminate detonator. This fuse does not have a safety chamber or a movable detonator-charge.
The Mark Y and Mark YII fuse constructions are substantially similar to the Mark IV, with the exception of the arming mechanism. In the Mark V fuse there is an additional bushing provided that shields the firing pin from accidental contact with the primer until after the gun is fired.. In the Mark YII fuse the firing pin is held off center and' in noncontacting relationship with the primer cap until after the gun is fired, whereupon the centrifugal spinning of the shell brings the firing pin into operative position with respect to the primer cap so that an impact with the target will fire the cap.
*47 The Mark III bomb fuse is a fuse construction used by the Government for bombs dropped from aircraft instead of projectiles fired from guns. This fuse construction is located at the base or rear of the bomb and comprises a tubular member with a booster charge surrounding it at its lower end. Slidably mounted in this tubular member is a carrier having a detonating charge of fulminate of mercury and tetryl, which has associated therewith a primer or percussion cap. A hammer or weight member with a firing pin is held spaced apart therefrom by means of a spring. The detonator, primer, and hammer are held in a position in the tubular member remote from the booster charge, that portion of the tubular member thus forming a safety chamber in which the premature explosion of the fulminate-of-mercury detonator may take place without effect. When the bomb is dropped from the airplane, the retaining pin is released and as the bomb falls head downward the detonator slides down into the booster charge, and the weight member with its firing pin is free to set off the primer when the bomb contacts with the ground.
Consideration of the Navy F-N diving shell will be found in a subsequent portion of this opinion.
Expressed in tabulated form, the following pertinent features are found in the fuses which have just been referred to in detail.

Fuses Timing a safety chamber and movable detonator:

Mark II fuse
Mark III bomb fuse

Fuses capable of being loaded for either delay or nonde-lay action:

Mark II fuse
Mark IY fuse
Mark Y fuse
Mark YII fuse

No delay action and no safety chamber:

Mark III fuse
All of the above-listed types of fuses utilized a fulminate-of-mercury composition for detonators and primers. In the instances in which the testimony specifically gave the-degree of pressure with which the fulminate-of-mercury *48 composition was loaded these pressures would appear to have what might be termed a rather sensitive characteristic. The Government test for bidders on Government fuses, as set forth in finding XXXVIII, is apparently for the purpose of establishing the degree of sensitiveness of detonators and fuses which will be safe and will not prematurely explode when fired from a gun. Such a test as outlined may be characterized as establishing a certain degree of insensi-tiveness of the fuse detonators, and there has been no evidence adduced to show the establishment of a degree of sensitiveness of the detonators, which would at least seem highly desirable if a fuse construction were to partake of rather peculiar characteristics of the disclosures of the patent in suit in which detonating compounds, such as fulminate of mercury and guncotton with a percentage of water, are supposed to function between two rather precise limits, i.e., insensitive enough to withstand the shock of firing from a gun, also insensitive enough to withstand the shock of penetrating light armor without detonation and yet sensitive enough to detonate when the shell impacts with heavy armor.
The Government fuses also differ from the fuses disclosed in the patents in suit in that while they may be loaded or constructed either in the delay or nondelay form, there is nothing in their mechanical construction which automatically cuts out or functionally removes the delay train, thus changing the fuse subsequent to the time it leaves the gun from a delay form to a nondelay form by virtue of the character of the target against which the fuse impacts.
While all of the above fuse structures of the Government are designed and intended to have their explosion initiated by the mechanical coaction of a firing pin and primer cap and not by the shock of impact of the projectile against the target directly causing the explosion of a detonator or other explosive in the shell because of its sensitiveness to shock, it has been admitted by defendant’s experts that such a form of explosion might be possible but that such explosion would be accidental and undesired. This appears to be entirely reasonable and as a matter of fact such an accidental explosion would be directly contrary to the results desired in *49 the Mark II, Mark IV. Mark V, and Mark VII fuses when they are loaded for a delay action so that explosion may properly take place after the shell has penetrated the armor or barrier against which it is fired. Although the Mark III fuse, known as the superquick fuse, has no delay action, its detonator has the same quantity of fulminate of mercury and the same amount of compression in loading as fuses Mark IV, V, and VII, which therefore indicates that it comes within the same category as far as limits of sensitiveness.
It is indeed impossible to visualize the impact of a shell carrying high explosives and detonators, such as fulminate of mercury, impacting upon a heavy steel plate or target with sufficient velocity and energy to deform or crush the shell without causing an explosion of the detonator, but if this is true of the alleged infringing Government structures it must be equally true of the prior-art structures which show the use of fulminate of mercury detonators in high-explosive shells as early as 1896. See patent to Allen, #562061, issued June 16, 1896, which shows a fulminate detonator mounted in a nose fuse in a shell containing high explosive. We are confident, however, that such an explosion would be accidental and undesired, and in the absence of testimony showing that the Government shells were specifically designed for this purpose no infringement can be based upon such accidental functioning. See Brothers v. United States, supra, 52 C.Cls., 462 ; 250 U.S. 88.
The Mark III bomb fuse is designed for use in bombs dropped from airplanes and similar aircraft, and therefore these fuses do not have to undergo the pressure shock due to firing from a gun, which seems to be the essence of the inventions in suit.
We will now more specifically consider the patent monopolies expressed by the claims of the patents in suit and their specific application to the alleged infringing structures listed, supra, in view of the prior art. Without referring at this juncture to the prior art in detail it is sufficient to state that the art is a crowded one, as will be evident from a study of finding XL, which lists nineteen prior-art patents and publications. From this finding and the findings following, which refer in detail to some of the prior-art structures, it *50 i's indisputable that room for invention in the art was circumscribed within very narrow limits.
We shall first consider patent it 117 9105. The claims of this patent which are alleged to be infringed are as follows: I, 2, 5, 6, 7, 8, 9, 10, 14, and 21. Claims 1 and 2 are as follows:
“ 1. In a fuse for shell, the combination with an explosive charge and a firing mechanism designed to explode a cap by retardation of the shell, of a vent and delay train arranged to transmit the flame of the cap to the explosive charge, and means operable only upon impact of the required intensity to shorten the delay train.
“ 2. Firing mechanism for projectiles comprising the combination, with a fuse stock, and a charge contained therein, of a percussion device, a time or delay-action train operable thereby for igniting said charge, and means operable by impact to shorten the effective length of said delay-action train.”
Each of these claims specifies “ a delay train ” and “ means ” to shorten the length of the delay train. The means disclosed in the patent for accomplishing this function is the chisel-ended punch member 19 of fig. 1, which is driven in on impact and shears off the delay train. As has already been stated, supra, while some of the Government’s fuses are constructed or loaded with delay trains, none of them have any equivalent mechanism or structure operable by impact to cut out or shorten the delay train.
As to the Mark III fuse and the nondelay forms of Marks II, IY, Y, and YII fuses and the Mark III bomb fuse there is no identity of structure with respect to claims 1 and 2, as these fuses do not have any delay train. If the above claims are construed with sufficient breadth to include an explosion of the detonator by impact alone as the “ means ” for shortening the effective length of the delay train, these claims will then obviously read upon the Sims-Dudley dynamite projectile. (See finding XLIV.) This projectile, which is illustrated herewith (p. 51), comprises a shell filled with explosive gelatin or dynamite and having a fuse construction which includes a detonator comprising an inner cylindrical casing which, as indicated in the drawing, employs as a detonator explosive dry guncotton. In the *52 forward end of this detonator is located a tube containing-fulminate of mercury which is ignited by a ball, which acts as a hammer, being driven forward by any sudden retardation of the shell and striking one or more percussion caps, which in turn ignite a delay train. The disclosure indicates that not only is the duration of the delay optional up to six or seven seconds, but that if desired the delay train can be omitted with a resultant instantaneous explosion.
The plaintiff in patent #1179105 suggests as a typical explosive detonator substance of sufficient sensitiveness to explode the detonator by impact, guncotton carrying 10% of" water. As the Sims-Dudley shell discloses or suggests to-those skilled in the art the use of dry guncotton, which is more sensitive to impact than that suggested by Isham, it readily follows that to give claims 1 and 2 of this patent a sufficiently broad interpretation to enable them to include an explosion of the detonator by impact shock of the shell against the target will enable them to be read upon the prior-art as exemplified by the Sims-Dudley shell and fuse construction. Such interpretation would accordingly render them invalid.
Attention is also directed to the Merriam fuse construction (see finding LII) described in a publication entitled “ Ordnance and Gunnery ”, published in 1902. The Merriam fuse,, as shown in the accompanying illustration taken from the above-mentioned publication, has a ball-shaped percussion member b which moves forward and explodes a cap g when the shell is retarded. The flame from the cap g ignites the-outer edge of an annularly located delay pellet i located on the forward surface of a valve plate h. The valve plate h has also moved forward, closing up the passageway o to the detonator charge or its equivalent j. Delay action thus occurs until the flame reaches the inner portion of the annular delay charge, when the flame will pass through the passageway o and cause an explosion of the shell after a predetermined delay. If, however, the shell strikes a target of sufficient strength to stop the shell, the plate A falls back,, thereby permitting immediate communication of the flame to the detonator charge j, the plate A therefore being (to quote the language of Isham, claims 1 and 2) the “ means- *53 operable only upon impact of the required intensity to .shorten the delay train.”
We direct further attention to the prior art disclosure on page 162 of the Journal of the United States Artillery, vol. ■38, published in 1912, defendant’s Exhibit Browne 4, which refers to a concussion fuse having a delay train with a stem •constructed so brittle that it would be broken by the impact of a shell against a target, thus cutting out or shortening the effective length of the delay train and admitting the flame immediately to the shell filler.
See also United States patent to Nordenfelt, #319025, of 1888, defendant’s Exhibit Browne 11, which also has a construction to render the delay train ineffective on impact to produce an immediate explosion.
A contemplation of these prior art structures against the •background presented by the remainder of the prior art, which shows numerous structures bordering closely on the Isham conception, leads us to the conclusion that the subject matter of claims 1 and 2 is invalid because of lack of patentable novelty.
We next consider claims 5 to 10. We quote claim 5, which is typical of this group:
“ 5. Firing mechanism for nonarmor-piercing projectiles ■comprising a charge explosible by shock due to impact of the projectile in flight against thick metal, but not explosible *54 by shock due to impact against water, in combination with a charge substantially not explosible by shock but explosible by a cap, and means for exploding the latter charge, said means being operable by impact of the projectile in flight, with material offering resistance equal to or greater than that offered by water.”
Each of these claims specifies a charge explosible by shock-due to the impact of the projectile in flight against thick: metal but not explosible by shock due to impact against water. This feature, if present at all in the above referred to Government fuse structures, is not there by design or intent but is merely accidental. (See Brothers case referred^ to, supra.) These claims, moreover, read directly upon the Sims-Dudley dynamite shell disclosure with its detonator of dry guncotton more sensitive to explosion by impact than the detonator disclosed by the patentee, and its delay action’ fuse which is ignited by a cap in cooperation with a percussion device operated when the shell strikes the water. These claims are therefore held invalid.
We next quote claim 14:
“ 14. In a projectile, the combination, with a delay-action train, arranged to be set in operation by retardation of the projectile in flight, of movable means for producing almost instantaneous explosion of the projectile, said means being' normally out of operative position but being arranged to be-brought into operative position by motion of the projectile in flight.”
There is no infringement of this claim by any of the above referred to Government fuse constructions, as this-claim specifically calls for “ movable means ” for producing almost instantaneous explosion of the projectile. This claim is specifically directed to the plunger 19 which shears off the projection or tit 14, thereby mechanically removing the delay train, and in addition is limited to a fuse having a delay action. The only Government fuses loaded for delay action-are Marks II, IY, V, or VII, and these wheni loaded for delay action have no equivalent movable means or mechanism for cutting out the delay train, and there is therefore-no infringement of this claim. The same is true of claim 21, which is substantially similar to claim 14, the same being specifically directed to a delay-action train and means for' *55 producing almost simultaneous explosion, said means being brought into operative position and being operable only by impact of the projectile. No identity of structure exists between claims 14 and 21 and the Government structures known as Marks II, III, IV, V, VII, and Mark III bomb fuse. |
We next consider Isham patent #1231909. The claims of this patent sued upon are the following: 4, 5, 19-25, inclusive, 31-34, inclusive, 44, 45, 47, and 48. Claim 4 is as follows:
“ 4. Firing mechanism for projectiles comprising, in combination, a safety chamber, a detonator charge normally maintained therein, but movable out of said chamber by firing of the projectile from a gun, and a delay-action train arranged to be set in action by impact with water and to explode said detonator after a delay of at least about one-half second.”
This claim is not infringed by Marks III, IV, V, and VII fuses for the reason that none of them have either the safety chamber or a detonator charge movable out of such a chamber. The Mark II fuse, nondelay form, and the Mark III bomb fuse, while having a construction involving a safety chamber, do not have any delay action train, which is a feature specified for by the claim. In addition, the Mark III bomb fuse, which is a construction utilized in bombs dropped from aircraft, does not possess a detonator charge movable out of a safety chamber by firing a 'projectile from a gum.
Attention is directed to the fact that the Mark III bomb fuse, with the exception of the details of the unlocking mechanism for the sliding detonator carrier, is similar to that disclosed in patent to Hale #1141540, issued June 1, 1915, on an application filed in the United States Patent Office May 15, 1914, a date almost two years prior to the filing of the Isham application (March 11,1916), which matured into patent in suit #1231909 now under discussion.
The Mark II fuse in the form in which the delay pellet is used has a detonator charge normally maintained in a safety chamber by a locking device. The centrifugal force resulting from the spinning of the shell after the same has been *56 fired unlocks the detonator carrier so that the detonator capsule is free to move out of the safety chamber when the projectile impacts with the target. This structure is therefore different from that disclosed in the patent and upon which the phraseology of the claim appears to be predicated, as the patentee’s structure includes a movable detonator capsule which is moved out of the safety chamber by virtue of a relative rotation between the detonator carrier and the remainder of the fuse produced by the spinning of the shell. In the Government structure the detonator charge while unlocked by the firing of the projectile from the gun and left free to subsequently move out of the safety chamber, can not be said to be “ movable out of said chamber ” in the same sense that applies to the patentee’s structure, in which the detonator carrier is actually moved out of the safety chamber by the firing of the projectile from the gun. There is, therefore, lack of identity between the Government structure and that specified by claim 4. If claim 4 is given a sufficiently broad construction to read upon the Mark II fuse in its delay form, it also appears to read upon the prior art fuse structure for high-explosive shells shown in the French publication, Revue D’Artillerie, published in 1903. (See finding L.) The mechanical structure of the Mark II fuse bears a closer resemblance to this prior art disclosure than it does to the patent in suit as it differs therefrom only in the method of releasing or unlocking the detonator carrier so as to permit its forward movement when the shell impacts with the target.
Claim 5 is substantially similar to claim 4 except that it includes as an additional element of limitation “ provision for eliminating the delay when the projectile strikes a solid target.” This provision referred to is clearly the punch member for shearing or cutting out the delay-action train, and as none of the Government fuse constructions under discussion have a device of this character there is no infringement of this claim. In addition, we might reiterate that no infringement could be predicated upon any accidental or unintended explosion caused by fragmentation of the shell hitting a heavy target.
*57 Claim 19 is as follows:
“ 19. Firing mechanism comprising a detonator charge containing fulminate of mercury arranged in a column of such length as to be explosible by shock of impact against heavy armor, but not to be explosible by shock of impact against water.”
This same phraseology with respect to the length of the column containing the fulminate of mercury occurs in claims 20, 21, 22, 23, and 24. Without lengthy discussion we repeat that any detonation of the fulminate of mercury detonators used in the Government fuses by shock of impact is not a feature of intended design, and such form of detonation would be accidental. Claims 19 to 24, inclusive, which are directed to this feature, are not infringed by the Government fuse structures.
Claim 25 is as follows:
“ 25. An explosive projectile comprising a burster charge, a combined time and percussion fuse device adapted to produce delayed explosion upon impact with water and substantially instantaneous explosion upon impact with solid material, a detonator charge operatively associated with said fuse device, and a safety chamber in which said detonator charge is normally maintained out of detonating relation to said burster charge, said detonator charge being movable into detonating relation to said burster charge by firing of the projectile from a gun.”
While some of the Government fuses have structures which produce a delayed explosion and others have means to produce a substantially instantaneous explosion, none of them have a combination of these means for automatically selecting either type of explosion after the shell has begun its flight. In addition, with the exception of the Mark II fuse and the Mark III bomb fuse, none of the fuse constructions have a safety chamber, and in the Mark II fuse construction the detonator charge is not “movable into detonating relation ” by the firing of the projectile from the gun, but is only released or unlocked so that it is subsequently movable when the shell impacts with the target. Also, as previously stated, the Mark III bomb fuse is not designed or intended to be fired from a gun.
*58 Claim 31 is as follows:
“ 31. Firing mechanism for projectiles comprising the combination, with a delay-action train arranged to be set in action by impact with material offering relatively low resistance, of a detonator charge arranged to be ignited by said train, a safety chamber within which said charge is normally maintained inoperative, means operable automatically upon firing of the projectile to establish detonating relation between said charge and the exterior of said chamber, and means operable by impact with metal or the like to substantially eliminate the delay action of said train.”
The Mark II fuse and the Mark III bomb fuse are the only Government fuses having a safety chamber, and none of the Government fuses has means to substantially eliminate the delay of a delay-action train, which in the patent in suit is the punch member which punches out or removes the delay train upon impact of the shell with the target. This claim is therefore not infringed.
Claim 32 is as follows:
“ 32. Firing mechanism for projectiles comprising the combination, with a delay-action train arranged to be set in action by impact with material offering relatively low resistance, of a detonator charge arranged to be ignited by said train, said charge being movable from nondetonating to detonating position, and means operable by impact with metal or the like to substantially eliminate the delay action of said train.”
This claim specifies a delay-action train and a detonator charge movable from nondetonating to detonating position. All of the Government fuses except Mark II fuse and Mark III bomb fuse have no movable detonator charge, and Mark II fuse in its delay form has no means operable by impact with meted or the like to substantially eliminate the delay action of said train. This claim is not infringed.
Claim 33 has the same specific limitations, including as elements a delay-action train; a charge movable from nonde-tonating to detonating position, and means to eliminate the delay upon impact, and what has been said with reference to the application of claim 32 to the Government structures applies also to claim 33. This claim is not infringed.
*59 Claim 34 is slightly more limited in scope over claim 33. This claim also specifies a delay action train with a detonator movable from an inoperative position and “ arranged to assume operative position automatically upon .■firing a projectile from a gun.” As is evident from prior discussion of the Government device, no such construction or its equivalent is found in them, and there is no infringe,ment of this claim.
Claims 44 and 45 both include the delay train and the means to eliminate the delay action, and there is no infringement of these claims for the reasons given, supra. The same is also true of claim 47, and it is unnecessary to reiterate our reasons why this claim does not read upon the Government structures.
Claim 48 is as follows:
“48. Firing mechanism for projectiles comprising, in •combination, a relatively insensitive explosive charge, a relatively sensitive explosive charge for detonating said relatively insensitive charge but maintained normally out of explosive relation thereto, means automatically operable by firing of the projectile from a gun for establishing explosive relation between said charges, and means for timing the -operation of the first means.”
One of the elements of this claim is “means for timing the operation of the first means.” This phrase has reference to that particular portion of the Isham structure which regulates by means of an inertia member or flywheel the movement of the detonator from its position in the safety chamber to its position in contiguity to the burster charge. The ■only two Government fuse structures which have the movement of the detonator charge from a safety chamber to ■a position surrounded by a burster charge are the Mark II fuse and the Mark III bomb fuse. In the Mark II fuse this movement does not take place until impact occurs. "In the case of the Mark III bomb fuse, while there may be ■present a form of structure which functionally accomplishes ■a timing movement of the detonator and its carrier down into contiguity with the burster charge due to a dashpot ^action, it cannot be said that this bomb fuse which is de *60 signed to be dropped from aircraft has “means automatically operable by firing of the projectile from a gun for establishing explosive relation between said charges.” It is accordingly held that this claim does not read upon any of the Government structures and is not infringed.
We now take up for discussion Isham Patent #1188178,. together with a consideration of the Navy F-N diving shell.
A call upon the Navy Department made by this court for drawings and disclosures relating to this shell was refused, by the Secretary of the Navy on the grounds that a compliance with this call would be injurious to the public-interest. During the taking of testimony plaintiff’s witness Isham testified at some length as to what his understanding of the shell was, and during the cross-examination; of defendant’s witness, Ralph Earle, who was Chief of Ordnance during the war, certain broad details of this shell were described, with a request that this matter be kept secret-as far as possible. The Government’s counsel objected to this line of testimony as not being proper cross-examination.. In addition, plaintiff has filed as an exhibit a drawing disclosing the cross-sectional contour of the Navy F-N diving shell shown in fig 1, .plate 1, chapter XV, of a publication entitled “ Naval Ordnance ”, which is a textbook prepared for the use of the United States Naval Academy.
We direct attention to Robinson on Patents, vol. Ill, p. 305, which reads as follows:
“ Where the defendant conceals the art or article he uses,, and declines to produce it for inspection, there is a strong presumption that it is identical with the one covered by the plaintiff’s patent, * *
Also Philadelphia Rubber Works Co. v. United States Rubber Reclaiming Works, 225 Fed. 789, which states, at-page 794, that—
“ The' defendant is not excused from giving negative testimony by reason of its desire to keep its process a business secret, for in such case, as said by Judge Lacombe in Badische Anilin & Soda Fabrik v. S. Klipstein & Co. et al. (C.C.), 125 Fed. 543:
“ ‘A court might not compel them to divulge it, but they= could at least show by affirmative proof that some one or *61 more steps (or all the steps) of the processes set forth in the patent had not been followed in the manufacture of the product.’ ”
See also Hazeltine Corporation v. National Carbon Co.., Inc., 6 U.S.Pat., Q. 235.
We refer to these citations not in any way in criticism of the act of the Navy Department in refusing to answer the call, for it was clearly within its rights in making such a refusal (see R.S., sec. 1076)—
“ The said court shall have power to call upon any of the departments for any information or papers it may deem necessary, and shall have the use of all recorded and printed reports made by the committees of each House of Congress, when deemed necessary in the prosecution of its business. But the head of any department may refuse and omit to-comply with any call for information or papers when, in his opinion, such compliance would be injurious to the public interest. [Italics ours.]
but as our reasons for enabling use to be made of whatever testimony has been presented over objections of defendant’s, counsel, and in accordance with the request of secrecy we have made a finding of fact which, outside of the disclosure of the Navy F-N diving shell in the textbook publication, is. ultimate in character (finding XXXVI). The identity found existing between the phraseology of claims 1 and 2' of patent #1179105 and the F-N diving shell is not material, for, as indicated earlier, these claims are invalid, due to lack of patentable novelty.
Claim 8 of this patent, #1188178, which is the only claim of this patent alleged to be infringed by the F-N diving shell, is as follows:
“ 8. In a projectile, the combination, with a shell containing a charge explosible by shock of impact of the projectile in flight against heavy metal but not explosible by shock of impact against water, said shell having a point so formed as to cause the shell to dive upon striking water, of a detonating device arranged to be set in operation by impact of the shell with water and to detonate said charge a predetermined period of time after such impact.”
The evidence indicates that the F-N diving shell does not have a charge explosible by shock of impact of the projectile *62 against heavy metal, and for this reason alone there is no identity of structure existing between the alleged infringing device and the patent monopoly as expressed by this claim. One consideration which assists us in reaching this conclusion is that the sectionalized drawing of this shell found in the publication entitled “ Naval Ordnance,” fig. 1, plate 1, chapter XY, plaintiff’s exhibit 24c, does not show any interior ribs or flanges for reducing the set-back pressure on the contained explosive when the projectile is fired from the gun. In addition, we find that the Isham patent #1188118 is seriously defective in its disclosure or description of the invention. The contractual relationship existent between the inventor and the public has been well recognized by the courts and it has been well settled that the descriptive portion of a patent must be sufficiently complete and comprehensive as to enable those skilled in the art to readily practice the same. We can do no better than to quote in this instance from page 91, vol. II, of Robinson on Patents:
“ However vague may be the representation of his invention given by the description, if from it, taken in connection with its accompanying drawings and model, a person skilled in the art to which it belongs can by the exercise of his mechanical powers and information alone construct and use the invention, the ambiguity is not fatal. But if experiment or inventive skill on the part of the constructor or the user is necessary to render the invention available in practice, the description is fatally ambiguous, and the patent granted on the specification which contains it is invalid.”
It is also necessary for the specification to be so clear as to enable the public to know the scope of the monopoly, and in this connection we quote from the Supreme Court decision in Permutit Oo. v. Ora/oer Corporation, 284 U.S. 52, 60, in which Justice Brandéis said:
“ The statute requires the patentee not only to explain the principle of his apparatus and to describe it in such terms that any person skilled in the art to which it appertains may construct and use it after the expiration of the patent, but also to inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.”
*63 The descriptive portion of Isham patent #1188178 lays considerable stress upon the set-back pressure occurring on the explosive loaded therein at the time of firing, and emphasizes the use of the ribs on the interior of the shell for segregating or separating the set-back pressure in zones so as to reduce the same at the base of the shell, the general intent of this obviously being to permit of the use of an explosive of such a character in a shell of this construction as will permit of safe firing from the gun and yet of sufficient sensitiveness to explode by shock of impact when the shell hits against heavy metal. The patentee fails to disclose what explosive should be used in this shell and how its degree of relative sensitiveness or insensitiveness may be ascertained, as well as other characteristics which seem to us pertinent, such as the weight of the shell, which deals directly with both the setback energy and impact energy, and the firing pressures to be used, which also bear direct relationship to the set-back or pressure shock upon firing. It is far from evident how the disclosure here given could be utilized without a great deal of experimentation as to these above enumerated features, and even if experimentation could solve this problem in the rather intricate science of ordnance, where would the line of demarcation occur between the prior art structures and explosives and the degree of sensitiveness to explosion by impact and those upon which the patentee would predicate his patent monopoly? This question may be more specifically asked with reference to the prior art as exemplified by the Sims-Dudley dynamite shell disclosed as having an explosive charge of dynamite or explosive gelatin in combination with a detonator of dry guncotton, a cup-shaped recess located in the nose end and left empty after the vane has fallen out, and a fuze having a delay action, and sensitive enough to ignite when the shell strikes the water.
After a careful consideration of all of these points we cannot help but arrive at the conclusion that this patent is void through a lack of proper description.
What we have said with respect to the lack of description in Isham patent #1188178 might readily be urged against each of the other Isham patents in suit, and we would give this subject further consideration; but this appears to be *64 unnecessary in view of the fact that no identity of structure and no infringement have been found to exist between any of the Government structures and any claims which might possess patentable novelty in any of the Isham patents.
The petition will be dismissed. It is so ordered.
Whalet, Judge; Williams, Judge; Littleton, Judge;: and GeeeN, Judge, concur.