### REED PROPELLER CO., Inc., v. UNITED STATES.

No. 42133.

Court of Claims.
Jan. 5, 1942.

Charles H. Walker, of New York City (Stephen H. Philbin and Alexander C. Neave, both of New York City, on the briefs), for plaintiff.

Clifton V. Edwards, of New York City, and Francis M. Shea, Asst. Atty. Gen. (J. F. Mothershead, of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and JONES, MADDEN, LITTLETON, and WHITAKER, Judges.

JONES, Judge.

Plaintiff seeks to recover for alleged infringement of two patents granted on application of Sylvanus A. Reed for improvements in "aeronautical propellers."

The first Reed patent is directed to certain principles involving the utilization of the effect of centrifugal force in order to give the propeller blades the rigidity necessary to resist the stresses in the blades. The second Reed patent is in general similar to the first patent, but relates more particularly to metal propellers and the use of certain alloys for their construction. Plaintiff alleges that both patents are infringed by the manufacture by or for and use by the United States of aeroplane propellers embodying the inventions covered by such patents.

Defendant contends that neither patent in suit gives sufficient information to enable those skilled in the art to practice the alleged invention; that the defendant does not infringe either patent, and that neither patent discloses any feature of novelty in view of the prior art.

The essential facts established by the record in this case are fully set forth in the findings, and except in connection with the controverted issues it is unnecessary to refer to them in detail.

Both of the patents in suit became the property of plaintiff; the first by assignment and the second by assignment of application and the subsequent issuance of patent direct to the company.

Findings 7 to 20, inclusive, have reference to an aeronautical propeller and the forces which act upon it in its operation. The forces and stresses which have particular bearing upon the patents in suit and the issues before us are graphically set forth in the drawing included in Finding 12, it being illustrated therein how the thrust or

pull of the propeller blade has a tendency to bend the blade forward, and how the centrifugal force, which acts in the plane of rotation of the blades, has a tendency to counteract the bending effect of the thrust.

The co-action of these two forces, as described and illustrated in the findings, has been, is, and always will be present in every propeller blade that has been or will be constructed, and the effects have been recognized for many years. In this connection we refer to the following quotation from the French patent to Penaud and Gauchot (Finding 41), issued February 18, 1876, which discloses an aeroplane having metal propellers. The Penaud and Gauchot specification states with reference to the propellers that "The centrifugal force of these screws will contribute powerfully to prevent them from yielding under the pressure that the air exerts on them."

In other words, what is graphically shown in Finding 12 was known as early as 1876.

### The First Patent in Suit (Reed Patent 1,463,556)

A discussion of this patent requires consideration of two aspects: First, the disclosure of the alleged improvement contained in the specification for the purpose of enabling one skilled in the art to practice the invention, and, second, the alleged monopoly claimed by the inventor as novel features of his invention, predicated upon the phraseology of the claims in suit.

Section 4888, United States Revised Statutes, 35 U.S.C.A. § 33, provides that the inventor of an invention " * * * shall file in the Patent Office a written description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same; * * *"

In the introductory portion of the specification the inventor makes the following statement:

"My invention relates to propellers for air craft and flying machines and discloses a novel principle for obtaining the necessary rigidity of the propeller blades to resist the stresses, thereby making possible the use of much thinner blades than heretofore with a gain in efficiency.

"Heretofore aeronautical propellers have been made of material such as wood or metal constructed to be structurally rigid against operative stresses, such rigidity usually being substantially sufficient, even when at rest, to resist tangential axial and radial stresses which would occur in full speed operation. It is obvious that when an aeronautical propeller, say eight feet diameter, is operated at say 1,200 revolutions per minute, centrifugal force adds to the structural rigidity due to the form of the propeller, a quasi or virtual or dynamic rigidity from the radial tension due to centrifugal force, and this added rigidity is a contingent advantage, but hitherto not regarded as an element which would justify omitting any considerable percentage of the elements providing static or intrinsic rigidity."

This quotation indicates that the essence of Reed's thought is that the stiffening effect due to centrifugal action is obvious, a statement well borne out by the Penaud and Gauchot patent of 1876, but that those skilled in the art as exemplified by propeller designers have not taken this stiffening effect into consideration for the purpose of omitting any *considerable* amount of the physical material previously thought necessary to obtain sufficient rigidity in operation. The patentee then goes on to state that at high rotative speeds the centrifugal effect increases, and that he has ascertained by many experiments that at certain speeds the structural rigidity can be discarded to a substantial extent, and reliance placed mainly upon the stiffening effect due to centrifugal force. The patentee further states that this "can be easily calculated from well known laws of mechanics."

The alleged discovery or principle which the inventor attempts to teach the public by means of the specification is dependency upon the contributing effect of centrifugal force to a degree or extent previously not contemplated by the propeller designer. This degree is defined by the following vague and indefinite statements contained in the specification.

On page 1, lines 15–17, it is stated with respect to the disclosure of the alleged novel principle, that it makes "possible the use of much thinner blades than heretofore with a gain in efficiency."

On page 2, lines 103–104, the specification states:

"I make my improved blade relatively thin and thinner than customary throughout * * *."

The specification also states on page 3, lines 59–64:

"The term relatively thin as used herein, is intended to define a body whose maximum thickness is that of a metal plate as distinguished from the thinness of a metal sheet, on the one hand, and the thickness of a metal bar or like bulky body, on the other."

The term "thinner than customary" and the term "thinner blades than heretofore used" are both as difficult and obscure in definition as is the difference between a metal plate as distinguished from a metal sheet. To predicate a disclosure to those skilled in the art upon such indefinite phraseology gives no help or aid to the propeller designer skilled in the art, who is entitled under the patent statutes to such a sufficiently clear disclosure by the specification as will enable him to know what propellers might be safely used or manufactured without practicing the Reed invention or discovery and which might not, and to arrive at this knowledge without the necessity of experimentation.

Referring next to the monopoly asserted in the claims in suit of the first Reed patent, these are fully set out in finding 23. For the purpose of their consideration, as the claims are more or less similar in character, it is sufficient to quote claim 1:

"1. . An aeronautical .propeller having single piece blades constructed of material of such thinness as to require dependence *partly but mainly* upon the radial tension exerted by centrifugal force to maintain the blades in operative form or shape." [Italics ours.]

The only distinction which the claims attempt to make with respect to the prior art is one of proportion, and the phrase "partly but mainly" used by the patentee is for this purpose.

The prior art pertinent to this first patent is set forth in detail in Findings 42–45 and 47–52, inclusive. We have already made reference to the Penaud and Gauchot patent of 1876, and its reference to the contributing stiffening effect of centrifugal force contained therein. *Entire* dependency upon centrifugal force to produce dynamic rigidity is taught in the United States patent to von Parseval (Finding 50), in which the blades were made of fabric and entirely devoid of structural or . inherent rigidity.

*Partial* dependency upon . centrifugal force is suggested to those skilled in ·the art by the German publication "Luftschrauben" (Finding 52). This article includes the statement " * * * For this reason, semi-stiff propellers have been built recently, whose arms are not so limp as to collapse entirely, when standing still, although their stiffness is yet so small that a considerable centrifugal force is needed to produce the necessary thrust."

The publication "Technische Berichte" (Finding 48), discloses mathematical calculations and formulae and states that the approximate blade tip deflection having been determined, the comparative importance of the relieving moments of centrifugal force can be seen from a mathematical equation set forth by the author. The publication concludes with two examples of the formulae and equations in which the deflection of the blade tips is reduced by the centrifugal force a total of about 25 or 30 percent.

With this prior art to which we have specifically referred, as well as the other prior art set forth in the findings, as a background, the words "partly but mainly" used to define an alleged novel principle of dependency upon centrifugal force are far from clear in their meaning. The word "partly" possibly creates a line of demarcation between the United States patent to von Parseval but does not with respect to the other prior art referred to.

The word "mainly" probably implies that the claims define a blade so thin that it would be dependent upon centrifugal force to an extent greater than 50 percent, but if this be true what is the criterion to which such a numerical value is to be applied? Is it the degree of tip deflection due to air . load or is it the ultimate strength or rupture value of the material, the minimum yield strength of the material, or an arbitrary assumed figure by propeller designers and termed the "safe limit" for stresses? The only light that the patentee attempts to shed on such a limit or criterion is the statement on page 1 that "There are two limiting considerations in the design or construction and operation of my improved construction of propellers—first, the limit of rupture, and—second, the limit of propeller efficiency measured by the ratio of thrust at stated flying velocities to torque."

The patent monopoly, instead of being expressed in concise and exact terms in accordance with the statute, is left largely to the individual opinions of various propeller designers, and the lack of any definite criterion indicates that various persons

would interpret the claims differently, and therefore they are ambiguous. We are of the opinion that this patent does not fulfill the requirements of the patent statutes and is therefore void.

In General Electric Co. v. Wabash Appliance Corporation et al., 304 U.S. 364, 369, 58 S.Ct. 899, 901, 82 L.Ed. 1402, the court said, "Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirement as to claims of invention or discovery. The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others, and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.'" See Isham v. United States, 76 Ct. Cl. 1, and Hamacek Marine Corporation v. United States, 26 F.Supp. 467, 88 Ct.Cl. 369.

In addition to lack of clarity in the specification and claims, it should be observed that the claims obviously purport to cover a wide range of possible propeller blades, sizes, speeds, and engine-power combinations, as well as a variety of propeller materials, and that neither the claims nor the specification give any exact sizes, dimensions, or formulae for their determination. The prior art previously referred to includes many suggested propellers, together with formulae, the use of which will permit the propeller designer to rely to any desired extent upon the beneficial effects of centrifugal force, and we do not believe that there is invention in the claims in suit of this patent.

Taking up next the issue of infringement, the specifications and data relative to the Government propeller charged as infringing in this case, are set forth in detail in Finding 42. This is an aluminum alloy propeller 9 feet in diameter, designed to be normally operated at 2,200 r. p. m. with an engine output of 525 h. p.

The calculations which deal with tip deflections indicate that if defendant's propeller be theoretically contemplated as operating under the stipulated conditions of power and air load, but without any effect of centrifugal force, the tip deflection would be 1.41 inches, and the calculated tip deflection with centrifugal force present under the stipulated operating conditions would be 0.455 inches.

The theoretical tip deflection of 1.41 inches without the effect of centrifugal force is less than 4% of the diameter of the propeller (108 inches) and the aerodynamic efficiency of the propeller would not be measurably impaired by such deflection.

Therefore, in so far as tip deflection might be regarded as a criterion with which to measure the restoring effect on centrifugal force, this propeller is not at all dependent upon centrifugal force to maintain its rigidity, and there would be no infringement from this standpoint.

In the present instance, however, plaintiff utilizes as a criterion or measure, the allowable safe limits for stress in this propeller, which is 12,000 pounds per square inch. The maximum bending stresses occur at 30 inches from the axis of the hub of the propeller, and the calculations indicate that under the normal operating conditions of the propeller, but under the hypothetical assumption that centrifugal force is entirely absent, the bending stresses at this point, due to air load alone, are 9,880 pounds per square inch. As this value is below the safe stress limit of 12,000 pounds, the Government propeller is not mainly dependent upon centrifugal force for a reduction of stresses below the safe operating value, and the claims in issue are not infringed with this stress value used as a criterion.

In actual operation of the propeller, however, centrifugal force is and must always be present. It can be stated that the action of centrifugal force has what might be termed both a beneficial and a detrimental effect, or, to use conventional bookkeeping parlance, centrifugal force requires an entry on both the debit and credit sides of the ledger. The detrimental or debit item is the additional tensile stress added to the blade by virtue of its rotating mass, and in the Government propeller this gives an added or direct tensile stress of 6,510 pounds per square inch. The beneficial or credit effect of centrifugal force is that the propeller is not bent or deflected to the degree it would assume with the air load alone, but to an intermediate degree in which the tensile bending stress due to air load is 2,830 pounds per square inch instead of 9,880 pounds per square inch, the figure previously given for the maximum stress

due to air load alone when the propeller was theoretically contemplated as functioning without any effect due to centrifugal force.

The action of centrifugal force in the Government propeller therefore contributes a net resultant reduction in tensile bending stress from 9,880 to 9,340 pounds (air load stress 2,830 plus centrifugal force stress 6,510), which is a reduction of 5.46%. What we have stated here is graphically shown in the drawing entitled "Effect of bending stresses with and without centrifugal force" and forming a part of Finding 35. Calculated in this manner there is no main reliance upon the stiffening effect of centrifugal force.

Plaintiff has taken an exception to Finding 35 and the drawing contained therein on the ground that the method of computation is erroneous. Plaintiff's suggested computation is based upon a total tensile stress figure of 16,390 pounds obtained through the addition of the bending stress of 9,880 pounds present due to air load alone, the value obtained when the propeller is theoretically contemplated as operating without any effect due to centrifugal force, plus a direct tensile stress of 6,510 pounds, which is direct tensile stress due to centrifugal force, or what we have previously termed the detrimental or debit effect of centrifugal force. Plaintiff then compares this total figure of 16,390 with the final resulting stress on the propeller with centrifugal force present of 9,340 pounds, and by proportionate comparison of these two figures argues that there is resultant reduction in tensile bending stress of 71.4%, i. e., that the Government propeller depends mainly upon the contribution of centrifugal force.

Such calculations are clearly in error. In the first instance, it is improper to add the direct tensile stress, due to centrifugal force, of 6,510 to the bending stress due to unrelieved air load. In doing this, plaintiff is using the debit side of the bookkeeping account with respect to the item of centrifugal force, and is neglecting the credit side. Second, when centrifugal force is contemplated as being present, as it must be to obtain the direct tensile stress, due to centrifugal force, of 6,510, the bending stress due to air load is not and can not be 9,880, for the presence of centrifugal force will prevent deflection of the propeller to an extent necessary to obtain this value; and third, the total stress figure of 16,390 pounds used by plaintiff is in itself erroneous, in that when the propeller is contemplated as operating without any relieving effect or any centrifugal force whatsoever, the bending stress of the Government propeller due to air load alone under these conditions is only a maximum of 9,880 pounds.

■ It is our opinion that claims 1, 2, 3, 4, and 13, the claims in issue of the first Reed patent in suit, even if they were not invalid, are not infringed by the Government structure.

The Second Patent in Suit
(Reed Patent 1,518,140)

■■ This patent is in general similar to the first patent, being also directed to an aeronautical propeller so designed as to be dependent upon centrifugal force for its effective operation.

The specification differs from or supplements the description contained in the first patent in two main respects, first, in that it discloses the thought of tapering the blades in width as well as thickness from the hub to the tip, and second, in that it discloses metal blades made of a specific material, such as alloys of aluminum and duralumin.

In addition, the specification refers to the necessity of making the blades strong enough to maintain rigidity of the blades against the change of pitch. In order to do this, the patentee states that "there is needed a correct adjustment of the weight of the material to dimensions and form at the successive blade cross sections." The effect of torsion stresses is fully set forth in Findings 14–18, inclusive, and it is sufficient to state that these are the stresses to which the patentee has reference when he refers to maintaining the rigidity of the blades against change in pitch.

The claims relied upon by plaintiff may be divided into two groups, the first group, comprising claims 1, 5, 14, 15 and 16, being directed to the constructional features of lightweight metal propellers, and claims 11, 12 and 13 being directed to the material or composition of a propeller blade. Claims 1, 5, 15 and 16, which are set out in detail in Finding 26, contain the following defining phraseology with reference to the utilization of centrifugal force:

Claim 1 " * * * depending partly but mainly upon centrifugal force for effective operation."

Claim 5 " * * * but has to be supplemented for an essential part by the kinetic rigidity resulting from the centrifugal force."

Claim 15 ' "* * * being such as to require the supplemental stiffening action of centrifugal force for operation."

Claim 16 "* * * depending upon centrifugal force for effective operation."

Insofar as these claims specify the degree or extent to which centrifugal force is employed, they fail to define a patent monopoly with any more clarity than similar type of claims of the first patent.

We have already discussed the lack of dependency upon centrifugal force to any great extent by the Government propeller, and the failure of a claim containing phraseology of this indefinite character to comply with the patent statutes and to enable one skilled in the art to readily elect whether he should manufacture or use within or outside of the patent monopoly. What we have previously stated with respect to the first patent in suit also applies to claims 1, 5, 15 and 16 of the second patent. These claims are not infringed and are invalid.

■■ Claim 14 of the second Reed patent is directed to a metal aeronautical propeller with blades increasing in cross-section from the tip toward the hub and containing the limiting phrase "graded in width and cross section only to the extent necessary to maintain the pitch twist of the blades."

An aeronautical propeller with blades increasing in cross-section away from the outer portions and toward the hub is disclosed in a drawing included in the prior art publication "Aviation and Aeronautical Engineering" available to those skilled in the art more than two years prior to the filing date of the second patent in suit (see Finding 42). The above quotation from this claim is indefinite as to meaning, for the patent specification gives no criterion as to power input or speed to which this limitation is applicable. Does this phrase contemplate normal power and propeller speed or maintenance of pitch twist at increased power and speeds such as might be present in a power dive?

We find it impossible to visualize what kind of a bridge an engineer would build if he were given a contract to construct a bridge designed in *"cross-section only to the extent necessary to maintain"* the bridge. Would this mean that if the normal expected load was 4 tons he would build a bridge that would collapse if a vehicle weighing 8,005 pounds attempted to cross it, or would he ask us what factor of safety we desired in such a bridge, or would he follow conventional construction and build the bridge so that it might successfully resist a load of 8 tons without collapse, and thus have a factor of safety of two? Certainly if this latter construction were followed, the bridge would no longer conform to having "a cross-section *only to the extent* necessary to maintain" a 4-ton load. We have used this simile to better emphasize the difference between the Government propeller and this particular phraseology of claim 14. As set forth in the findings and in particular in Finding 38, the Government propeller which is designed to rotate in normal operation at 2,200 r. p. m. with an engine output of 525 h. p. is constructed strong enough not only to maintain its pitch twist under these stipulated conditions, but in addition has an ample factor of safety, in that the whirl test of this same propeller indicates a smooth thrust curve up to 2,400 r. p. m. with a power input of 1,152 h. p., or more than twice the normal power input. We are therefore of the opinion that this claim also comes within the category of indefiniteness with respect to patent monopoly, and is invalid, and that the Government propeller does not infringe this claim.

■ The claims in issue of the second patent, which are directed to the material or composition of aeronautical propellers, are as follows:

"11. An aeronautical propeller having blades formed of an alloy of aluminum.

"12. An aeronautical propeller having blades formed of duralumin.

"13. An aeronautical propeller having blades formed of forged alloy of aluminum."

Duralumin was originally a trade name for one or more alloys of aluminum developed by a Dr. Wilm in Germany about 1909. The usage of the term "duralumin" has now become more generic and is now understood by those skilled in the aeronautical art as meaning in general a lightweight aluminum alloy. As thus used the term is applicable to the material used in the construction of the Government propeller, and the phraseology of the three material claims is also applicable to the Government structure.

The scope of these claims is such that they would be infringed by any aeronautical propeller made of the material specified, whether solid or hollow, and irrespective of the dimensions, power or shape charac-

teristics of the same, and anyone constructing an aeronautical propeller of any type and using materials specified would invade the monopoly which they are intended to express.

We are of the opinion that these claims express no patentable invention. Prior to August 30, 1921, the date of the inventions embodied in these claims, it was known and had been suggested to those skilled in the art of propeller construction and design that aluminum and forged alloys of aluminum, such as duralumin, because of their strength and lightness, were satisfactory building materials for aeronautical propellers, and the physical characteristics of these materials were well known and published prior to this date.

The various prior art publications which refer to the use of duralumin and forged alloys of aluminum for propeller construction are referred to in detail in Findings 52–58 inclusive, and it is unnecessary to again set forth all of them in detail. We, however, make specific reference to a German publication, "Luftschrauben," published in 1912 (Finding 52), in order to better answer plaintiff's argument with respect to the material claims. This publication is an article entitled "Book of Instruction for the Construction and Treatment of Propellers" and discloses the stresses upon the blades of aeronautical propellers with reference both to centrifugal force and the deflecting moment of the thrust. The article also suggests that aluminum may be employed for the blades of a propeller, this being utilized by means of forming dies. The article sets forth a table of strength values for propeller materials, which includes pure aluminum, aluminum alloys, and duralumin sheet, forgings and pressings.

Plaintiff urges that this prior publication merely suggests duralumin as a material and does not instruct those skilled in the art how to construct a propeller of this material. The answer to this is found in the successful flight operation of the Bastow aluminum aeronautical propeller in 1910 at Pawtucket, Rhode Island, the details of which are set forth in Finding 60. With workmen sufficiently skilled in the art in 1910 to successfully construct and operate an all-metal propeller having aluminum blades and with the numerous formulae directed to propeller design and propeller characteristics, it would be but a step in degree and within the knowledge of the propeller designer to construct a propeller of aluminum alloy or alloy forgings once the suggestion of its use for this purpose has been made, and the strength and weight characteristics of the alloy are known.

Cases too numerous to cite indicate that it is within the skill of the trained workman to do many things. He may reduce weight; he may increase the size of parts; he may make parts stronger by the substitution of one familiar material for another; he may make them lighter or heavier, or he may divide one part into two, or combine two parts into one.

Plaintiff further urges that a presumption of patentability should be based on the fact that the metal propeller did not come into successful and normal use until after the Reed inventions. Such a presumption sometimes has a controlling influence, but this is only true when the question of invention is difficult to determine, and in the present case the factors are such that we do not invoke this presumption as a helpful factor. General acceptance and usage of an article depend upon many things, and from our study of the prior art it is apparent that the aeronautical industry was moving rapidly toward the adoption of the metal propeller, irrespective of the Reed patents.[1] New articles with the latest improvements in general supersede older ones as an industry develops, and there exists among those skilled in an art a tendency to carry forward and improve machines and processes. Also, in many instances an article comes into wide use from being placed upon the market by energetic manufacturers with strong financial backing. All these factors tend to offset any presumption due to commercial adoption.

For these reasons we are of the opinion that claims 11, 12, and 13 express no patentable invention, and are therefore invalid.

The petition is accordingly dismissed.

It is so ordered.

WHALEY, Chief Justice, and MADDEN and LITTLETON, Judges, concur.

WHITAKER, Judge, took no part in the decision of this case.

---

[1] Cuno Engineering Corporation v. Automatic Devices Corporation, 62 S.Ct. 37, 86 L.Ed. ——, decided by the Supreme Court November 10, 1941.